No. 22-11222-J

# In the United States Court of Appeals for the Eleventh Circuit

---

CAMBRIDGE CHRISTIAN SCHOOL, INC.,

*Plaintiff-Appellant*,

v.

FLORIDA HIGH SCHOOL ATHLETIC
ASSOCIATION, INC.,

*Defendant-Appellee*.

---

On Appeal from the United States District Court For the Middle District of Florida
No. 8:16-cv-02753-CEH-AAS

---

## APPELLANT'S INITIAL BRIEF

---

Kelly J. Shackelford
Jeffrey C. Mateer
Hiram S. Sasser, III
David J. Hacker
Jeremiah G. Dys
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, TX  75075

Rebecca R. Dummermuth
FIRST LIBERTY INSTITUTE
227 Pennsylvania Ave., S.E.
Washington, DC  20003

Jorge Perez Santiago
STUMPHAUZER FOSLID SLOMAN ROSS &
KOLAYA, PLLC
Two S. Biscayne Blvd., Ste. 1600
Miami, FL  33131

Jesse Panuccio
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL  33301
(954) 356-0011

Blake Atherton
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC  20005

Eliot Pedrosa
JONES DAY
600 Brickell Ave., Ste. 3300
Miami, FL  33131

Adam M. Foslid
WINSTON & STRAWN LLP
200 S. Biscayne Blvd., Ste. 2400
Miami, FL  33131

## CERTIFICATE OF INTERESTED PERSONS

I certify that, to the best of my knowledge, the following is a complete list of all persons and entities known to have an interest in the outcome of this appeal:

### District Court Judges

Honeywell, Charlene E., District Judge

Sansone, Amanda A., Magistrate Judge

### Law Firms Representing Plaintiff/Appellant

Boies Schiller Flexner LLP

First Liberty Institute

Greenberg Traurig

Jones Day

Stumphauzer Foslid Sloman Ross & Kolaya

Winston & Strawn LLP

### Counsel for Plaintiff/Appellant

Atherton, Blake

Butterfield, Justin E.

Dys, Jeremiah G.

Dummermuth, Becky

Foslid, Adam M.

Hacker, David

Mateer, Jeff

Panuccio, Jesse M.

Pastor, Graziella

Pedrosa, Eliot

Peral, Stephanie

Santiago, Jorge

Sasser, Hiram S.

Shackelford, Kelly

**Plaintiff/Appellant**

Cambridge Christian School, Inc.

**Law Firms Representing Defendant/Appellee**

Clayton-Johnston, PA

Holland & Knight LLP

**Counsel for Defendant/Appellee**

Ireland Jr., Leonard E.

Mahfood, Daniel M.

Mercier, Judith M.

Nauman, Robin M.

Royal, Kristin N.

**Defendant/Appellee**

Florida High School Athletic Association, Inc.

**Mediator**

Grilli, Peter J.

**Law Firm Representing Movants**

Law Office of Heather Morcroft

**Counsel For Movants**

Elliott, Patrick

Grover, Sam

Morcroft, Heather

**Movants**

Central Florida Freethought Community

Freedom From Religion Foundation, Inc.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Eleventh Circuit Rule 28-1(b), Appellant certifies that Appellant is not a subsidiary or affiliate of a publicly owned corporation and that Appellant is not aware of any publicly owned corporation, not a party to the litigation, that has a financial interest in the outcome of this case.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant respectfully requests oral argument. This appeal presents substantial questions under the First Amendment and the Supreme Court's recent precedent on the Free Exercise and Free Speech Clauses. Appellant respectfully submits that the decisional process will be aided by the Court's opportunity to question the parties regarding their arguments.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ......................................... i

CORPORATE DISCLOSURE STATEMENT ......................................... iii

STATEMENT REGARDING ORAL ARGUMENT ............................... iv

TABLE OF AUTHORITIES .................................................................. viii

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF ISSUES ......................................................................1

INTRODUCTION ...................................................................................2

STATEMENT OF THE CASE.................................................................4

    I.    Facts............................................................................................4

        A.    Cambridge Christian's Belief in and Practice of
Communal Prayer ...........................................................4

        B.    FHSAA's Regulation of High School Athletics.........................5

            1.    Regular Season ..................................................6

            2.    State Championship Series .................................7

        C.    FHSAA Expressly Approved a Loudspeaker Prayer at the
2012 Championship Game..........................................9

        D.    Prayers Over the Loudspeaker at CCS Games in 2015 ............11

        E.    FHSAA's Adoption of the Prayer Ban Before the 2015
Championship Game....................................................12

        F.    FHSAA Routinely Permitted and Broadcast Prayers and
Religious Messages at Its Events and Over Its Platforms ........15

        G.    Loudspeaker Prayer at Post-2015 FHSAA Playoff Games ......18

H.    FHSAA Transmitted Solemnizing Messages over the Loudspeaker ..............................................................................19

I.    Private Speech at State Championship Series Events..............22

    1.    Private Speech over the Loudspeaker............................22

    2.    Cheerleaders Along the Sidelines.................................28

    3.    On-field Coach/Player Media Interviews......................28

    4.    Sponsor Speech through Signs, Videos, and other Promotions...................................................................29

    5.    Fan Signs and Banners .................................................29

    6.    Speech with Which FHSAA Did Not Want to Associate.......................................................................30

II.    Course of Proceedings...........................................................................31

III.    Standard of Review ...............................................................................33

SUMMARY OF ARGUMENT ...................................................................33

ARGUMENT ..............................................................................................35

I.    The Prayer Ban Violates CCS's Free-Exercise Rights. .....................35

A.    CCS's Communal Prayers Are a Sincere Religious Practice...............................................................................35

B.    The Prayer Ban is Neither Neutral nor Generally Applicable. ...........................................................................39

C.    The Prayer Ban Fails Strict Scrutiny. .....................................41

II.    The Prayer Ban Violates CCS's Free-Speech Rights ........................44

A.    The Loudspeaker is Not a Forum for Only Government Speech ...................................................................................44

    1.    History Brims with Private Speech over the Loudspeaker..................................................................45

2.      Endorsement Evidence Shows the Loudspeaker Is
        Not Used Solely for Government Speech .....................51

3.      The Control Evidence Shows the Loudspeaker Is
        Not Used Solely for Government Speech .....................55

B.      The Prayer Ban Constitutes Illegal Viewpoint
        Discrimination...........................................................57

C.      The Prayer Ban Constitutes an Arbitrary and
        Unreasonable Regulation of Speech. ........................60

CONCLUSION ......................................................................61

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adler v. Duval Cnty. Sch. Bd.*,
  250 F.3d 1330 (11th Cir. 2001) ......................................................................53

*Am. Bankers Ins. Grp. v. United States*,
  408 F.3d 1328 (11th Cir. 2005) ......................................................................33

*Board of Ed. of Westside Cmty. Schs. v. Mergens*,
  496 U.S. 226 (1990) ......................................................................................52

*Cambridge Christian School, Inc. v. Florida High School Athletic Ass'n, Inc.*,
  942 F.3d 1215 (11th Cir. 2019) .............................................................. *passim*

*Carson v. Makin*,
  142 S.Ct. 1987 (2022) .................................................................................2, 41

*Chandler v. Siegelman*,
  230 F.3d 1313 (11th Cir. 2000) ................................................................ 39, 52

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) .................................................................... 35, 39, 41, 43

*Employment Div. v. Smith*,
  494 U.S. 872 (1990) ................................................................................ 35, 39

*Espinoza v. Montana Dep't of Revenue*,
  140 S.Ct. 2246 (2020) .................................................................................2, 41

*Fulton v. City of Philadelphia*,
  141 S.Ct. 1868 (2021) ........................................................... 2, 34, 37, 40

*Good News Club v. Milford Cent. Sch.*,
  533 U.S. 98 (2001) ........................................................................................42

*Intervarsity Christian Fellowship/USA v. University of Iowa*,
  5 F.4th 855 (8th Cir. 2021) ............................................................................40

*Kennedy v. Bremerton Sch. Dist.*,
  142 S.Ct. 2407 (2022) ............................................................................. *passim*

*Marsh v. Chambers*,
    463 U.S. 783 (1983) ............................................................45

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
    138 S.Ct. 1719 (2018) .....................................................2, 39

*Minnesota Voters All. v. Mansky*,
    138 S.Ct. 1876 (2018) ........................................................60

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ......................................... 57, 58, 59, 60

*Shurtleff v. City of Boston*,
    142 S.Ct. 1583 (2022) ................................................. *passim*

*Thomas v. Review Bd. of Ind. Employment Security Div.*,
    450 U.S. 707 (1981) ...................................................... 37, 38

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S.Ct. 2012 (2017) .....................................................2, 41

*Van Orden v. Perry*,
    545 U.S. 677 (2005) ...........................................................42

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ...........................................................55

**Statutes**

28 U.S.C. § 1291 .....................................................................1

28 U.S.C. § 1331 .....................................................................1

28 U.S.C. § 1367 .....................................................................1

**Rules**

Fed. R. Civ. P. 56(a) .............................................................34

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and over the state-law claims pursuant to 28 U.S.C. § 1367. On March 31, 2022, the district court granted summary judgment in Appellee's favor. Appellant filed a Notice of Appeal on April 14, 2022. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from final judgment.

## STATEMENT OF ISSUES

Whether a state actor violated free-exercise and free-speech rights by denying a religious school access to a stadium loudspeaker to engage in a communal pregame prayer at a championship football game between two Christian schools.

1

## **INTRODUCTION**

*Kennedy*. *Carson*. *Shurtleff*. *Fulton*. *Espinoza*. *Masterpiece Cakeshop*. *Trinity Lutheran*.[1]  In recent years, the Supreme Court has emphatically reaffirmed that the government may not discriminate against religious practice and speech, and that a "government entity's concerns about phantom constitutional violations" do not "justify actual violations of an individual's First Amendment rights." *Kennedy*, 142 S.Ct. at 2432.  Yet the Florida High School Athletic Association (FHSAA), a state actor, continues to defend a policy that impermissibly discriminates against the religious practices and expression of its member schools.  Specifically, in 2015, FHSAA reversed its prior position and announced that when two religious schools play in the state championship football game, they are prohibited from using the stadium loudspeaker for pre-game prayer (the "Prayer Ban").  FHSAA offered only one reason for this ban: prayer over the loudspeaker could be "viewed as [FHSAA] endorsing or sponsoring religion." A-12611.[2]

 That rationale is eviscerated by the aforementioned cases, which explain that the Establishment Clause is a complement to, not a restriction on, free exercise.

---

[1] *See Kennedy v. Bremerton Sch. Dist.,* 142 S.Ct. 2407 (2022); *Carson v. Makin*, 142 S.Ct. 1987 (2022); *Shurtleff v. City of Boston*, 142 S.Ct. 1583 (2022); *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021); *Espinoza v. Montana Dep't of Revenue*, 140 S.Ct. 2246 (2020); *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S.Ct. 1719 (2018) *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012 (2017).

[2] Appendix pages are cited as "A-[page #]."

*Kennedy*, 142 S.Ct. at 2426. Unsurprisingly, then, in this long-running litigation, FHSAA has seemingly abandoned the original rationale for its Prayer Ban and instead resorts to attacking the sincerity of Cambridge Christian School's ("CCS") religious practice. That attack fails both as a matter of record (CCS *always* engages in prayer over the loudspeaker when playing other Christian schools or in postseason games) and as a matter of law (because it is for religious actors, not the state, to define religious beliefs and practices). Because the Prayer Ban targets and burdens CCS's sincere religious practice, and is not justified by a compelling interest or narrowly tailored, it is unconstitutional.

Likewise, the Prayer Ban violates CCS's free-speech rights. FHSAA claims that all speech over the loudspeaker is government speech. Yet the record shows that FHSAA permits schools and other private actors to deliver a variety of messages over the loudspeaker: welcoming remarks, promotions, music, and even prayers (at all games *except* the championship). Moreover, FHSAA uses the loudspeaker to call for moments of silence, deliver ethical messages, promote sportsmanship, and honor persons and events. But it will not allow these same themes to be expressed under a religious banner. Because the Prayer Ban constitutes viewpoint discrimination, and has been arbitrarily applied, it violates CCS's free-speech rights.

This case has been here before. Previously, this Court reversed the district court's dismissal, finding that CCS stated valid free-exercise and free-speech claims.

3

Discovery yielded the evidence necessary for CCS to prove its claims, yet the district court again ruled in FHSAA's favor, this time on summary judgment. For seven years, CCS has fought to vindicate its constitutional rights. For seven years, FHSAA has resisted. It is time for this saga to end. CCS respectfully asks this Court to again reverse the district court's erroneous decision and enter summary judgment in CCS's favor.

## STATEMENT OF THE CASE

### I. FACTS

#### A. Cambridge Christian's Belief in and Practice of Communal Prayer

CCS is a Christian school that seeks to "glorify God in all that we do." A-11934 (¶10). One way CCS realizes this mission is through communal prayer. A-11818 (Tr.84:15-18); A-11904-06 (¶¶7-9); A-11912-13 (¶¶7-8); A-13360-61 (¶¶7-9); A-11934 (¶¶9-10); A-11946 (¶6).

CCS's religious beliefs are incorporated into the school's athletic life, both through the Athletic Department's mission and policies, A-12624 ("chief end is to glorify Christ in every aspect of our athletic endeavors"), A-12626 (CCS spectators are to "conduct themselves in a Christ-like manner"), and in practice. For example, CCS's football and cheerleading teams pray at every practice and game. A-11714 (Tr.32:21-33:4); A-11904 (¶7); A-11939-40 (¶30); A-11943; A-12638. Since 2003, when CCS began playing football, it has opened every regular-season home game,

4

and every regular-season away game against a Christian school, with a prayer transmitted over the loudspeaker. A-11804, 11830 (Tr.26:23-25, 131:11-132:5); A-11898 (¶7); A-11904-06 (¶¶7, 9, 10, 12); A-11912-14 (¶¶7, 10, 12, 14-15); A-13361-63 (¶¶11, 13, 15); A-11936-38 (¶¶17, 25); A-11947-48 (¶¶11, 13, 16).

CCS engages in pre-game prayer, among other reasons, to: solemnize and commemorate the occasion; recognize and thank God for the opportunity to participate; request God's protection for players; recognize and thank God for certain individuals' contributions to the CCS community; and request that God help participants and fans display good sportsmanship and attitudes. A-11905 (¶¶8, 9); A-11935-37 (¶¶12, 15, 19); A-11952 (¶¶26-29); A-12689 (example of a CCS pre-game prayer).

In large venues, like football stadiums, use of public-address (PA) systems (or loudspeakers) is necessary to permit all CCS community members in attendance to hear and participate in communal prayer. A-4234 (¶7 & n.5); A-11521 (Tr.194:10-19).

## B. FHSAA's Regulation of High School Athletics

FHSAA is a state actor that governs Florida high school athletics. FHSAA's membership includes public and private schools. A-13453-54 (¶¶7, 18). CCS has been an FHSAA member since 1989 and retains eligibility for membership through

its accreditation by Christian Schools of Florida.  A-11932-33 (¶¶3, 5, 7); A-12008 (RFAs 10-12).

FHSAA divides its member schools into classes.  A-13455 (¶¶21).  CCS is in Class 2A, which mostly consists of "small private and parochial schools."  A-645 (¶9); A-13455, 13458 (¶¶21, 35).

FHSAA enforces Bylaws, Policies, and Procedures governing member school athletic programs and FHSAA contests.  A-13454 (¶19); A-12066 (2015 Bylaws); A-12107 (2015 Policies); A-12183 (2015 Procedures); A-12327 (2012 Bylaws); A-12367 (2012 Policies); A-12446 (2012 Procedures).

1.    <u>Regular Season</u>

FHSAA comprehensively regulates the football regular season.  A-10849 (Tr.49:2-4); A-4235 (¶11 & n.7).  With respect to the loudspeaker, FHSAA designates the PA announcer a "bench official" who must "maintain complete neutrality at all times" and must "not be a 'cheerleader' for any team."  A-12194 (§2.4.1).  But the PA announcer is not an FHSAA employee or contractor; instead, the host school selects the PA announcer.  A-10850 (Tr.53:4-6); A-11034 (Tr.175:13-15).

FHSAA provides member schools a "Public Address — Pregame Sportsmanship Announcement," which the PA announcer must read.  During CCS's

home football games in 2015, the PA announcer read this message.  A-10849-50 (Tr.49:25-50:6); A-11949 (¶18); A-12691.

### 2.    State Championship Series

To determine a state champion in most sports, FHSAA conducts a Florida High School State Championship Series ("SCS").  A-13455 (¶22); A-12088 (§8.7.1).  For Class 2A football, the SCS consists of four games: Regional Semifinal, Regional Final, State Semifinal (collectively, "playoffs"), and State Championship. A-13455 (¶22); A-12198 (§3.2.1.2.1).  FHSAA comprehensively "regulated and promoted" its 2015 football playoff games, A-10849 (Tr.49:5-7), dictating everything from venue requirements, to host school selection, to merchandising, to revenue sharing, to on-field and off-field conduct, and more.  A-4236 (¶16 & n.8). FHSAA required playoff game programs to display "both the appropriate FHSAA sport logo and sportsmanship logo." A-12197 (§3.1.7).  Because playoff games were "not 'home contests' for the host schools," FHSAA required that playoff games "maintain[]" "an atmosphere of neutrality" and prohibited playoff games from having "[s]pecial festivities held as part of, or in conjunction with, regular season home contests." A-12130 (§10.8.1).

FHSAA required playoff venues to have a PA system and designated the PA announcer a "bench official" who must "maintain complete neutrality at all times" and could "not be a 'cheerleader' for any team."  A-12139 (§14.4.2.5); A-12197

(§3.1.8). The PA announcer for playoff games was not an FHSAA employee or contractor and was not selected by FHSAA. A-10850 (Tr.53:7-9); A-11034 (Tr.175:13-18); A-11506 (Tr.134:7-10); A-11950 (¶21). FHSAA policy required playoff PA announcers to "follow the FHSAA script for promotional announcements, … player introductions[,] and awards ceremonies" and limited "other announcements" to a specific list, which included "[m]essages provided by host school management." A-11034, 11040 (Tr.176:1-3, 201:18-23); A-12197 (§3.1.8). FHSAA created the PA scripts for playoff games and forwarded them to teams to use at the games. *See* A-4278-90 (summarizing scripts produced in discovery); A-10991, 11034 (Tr.109:14-19, 175:23-176:3); A-11092 (Tr.83:1-3); A-10756 (Tr.23:2-7); A-11457, 11505-06 (Tr.29:3-4, 133:6-14, 134:4-6); A-10760-61 (Tr.40:15-16, 42:21-43:2); A-12693. FHSAA playoff scripts contained messages from FHSAA's corporate sponsors. For example, the 2015 football script contained an ad for Champion—an apparel company, A-11951 (¶ 22), A-11964—and this announcement was "read on behalf of Champion" and was a message "from Champion," A-11506 (Tr.135:21-22, 135:25-136:5).

Within the SCS, championship (or finals) games are subject to the same FHSAA regulations as playoff games. A-11092 (Tr.84:17-85:3); A-12088 (§8.7.1); A-12197-98 (§§3.1-3.11); A-12112-13, 12124-30 (§§3.1, 3.3, 9.7-9.11, 10). Teams

participating in championship games also receive a Finals Participant Manual. A-11020 (Tr.120:17-21); A-12285 (2015 Manual); A-12560 (2012 Manual).

All FHSAA football championship games from 2007 to 2018 occurred at the Citrus Bowl in Orlando, Florida—a publicly-owned stadium with a seating capacity exceeding 50,000. A-4237 (¶24). The Central Florida Sports Commission ("CFSC") was a "community partner" of the Citrus Bowl that contracted with the Citrus Bowl for events. A-11623 (Tr.27:12-21, 28:1-8). FHSAA and CFSC entered into an agreement under which CFSC hosted FHSAA football championships at the Citrus Bowl. A-12753; A-12792. CFSC, not FHSAA, selected and hired the PA announcer for SCS finals at the Citrus Bowl. A-11640 (Tr.95:4-8); A-12723-25. As with the playoffs, FHSAA prepared the PA scripts for the finals, but FHSAA is "without knowledge as to whether and to what extent the public-address announcer read the subject script at the 2015 Class 2A Championship Game." A-12038 (RFA 121).

### C.    FHSAA Expressly Approved a Loudspeaker Prayer at the 2012 Championship Game

In 2012, two religious schools—University Christian School ("UCS") and Dade Christian School—made it to the Class 2A FHSAA Football Final. A-13457 (¶32). During an organizational call prior to the game, UCS asked FHSAA's permission to use the Citrus Bowl loudspeaker for a pre-game prayer. A-11892-93

(¶¶4-5);  A-11495-96  (Tr.93:7-18,  94:4-6);  A-11390  (Tr.44:6-22);  A-11574 (Tr.55:22-56:18, 63:8-10); A-12792.

FHSAA expressly approved the request.  A-11390-92 (Tr.44:9-24, 45:7-22, 46:20-24, 47:16-18, 48:1-10, 51:2-11) (former FHSAA communications official testifying that FHSAA Executive Director Dearing told him to include prayer prompt in PA script); A-11578 (Tr.71:10-73:13) (FHSAA Director of Athletics testifying that FHSAA senior management specifically approved request); A-11645 (Tr.117:5-9, 117:14-18) (CFSC senior vice president testifying that FHSAA granted approval); A-12794 (email chain conveying FHSAA's approval to CFSC). Subsequently, CFSC created "Special Notes for 1st Weekend of FHSAA Football." CFSC wrote:

> Due to two Christian schools playing during Friday's 1pm game, the FHSAA has approved a prayer to be read over the PA system by Dade Christian[']s princip[al] Stan Stone.  He will have a special credential and be escorted to the PA room prior to the prayer.  This will happen pregame prior to the Orange Bowl awards and will be written in the script.

A-13006; A-11644 (Tr.112:1-3, 112:25-113:3, 119:11-120:10).

In the script it created for the game, FHSAA included a prompt for the prayer:

> **4.    PRAYER (30:00 on clock)**
>
> UNIVERSITY CHRISTIAN AND DADE CHRISTIAN WILL LEAD A PRAYER OVER THE PA SYSTEM AT THIS TIME. (THIS SHOULD TAKE ONE MINUTE OR LESS)

A-4292.

Consistent with this prompt, Dade Christian delivered a pre-game prayer over the loudspeaker at the 2012 FHSAA Class 2A game.  A-11894 (¶9); A-11162 (Tr.39:5-9); A-11381, 11395-97 (Tr.9:6-21, 63:19-64:3, 71:12-72:1, 72:17-75:3); A-12798; A-11580, 11582 (Tr.79:20-80:1, 89:8-13); A-11076 (Tr.21:11-14). According to FHSAA's Director of Athletics, the prayer was not a message from FHSAA, and FHSAA has no record of complaints about it.  A-11580, A-11582 (Tr.81:8-11, 87:2-19, 88:1-17).

## D.    Prayers Over the Loudspeaker at CCS Games in 2015

In 2015, CCS played its home games at Skyway Park in Tampa, a government-owned facility.  A-11913 (¶11); A-11946 (¶8).  As with every season, during the 2015 regular season, a CCS representative led a prayer over the loudspeaker before each home game.  The CCS representative led these prayers while standing next to an FHSAA game official in the announcer's booth.  The prayers were not reviewed, edited, or preapproved by anyone, including the game official in the announcer's booth.  FHSAA has never objected to or prohibited these loudspeaker prayers—not prior to 2015, not in 2015, and not since the filing of this lawsuit.  A-11898 (¶7); A-11906 (¶10); A-11914 (¶12); A-13362-63 (¶¶13, 16); A-11936-37 (¶¶17-18); A-11946-49 (¶¶9, 12-13, 16-17).

CCS qualified for the Class 2A SCS in 2015 and proceeded to win all three of its playoff games: (1) against Northside Christian School on November 13, 2015, at

Skyway Park; (2) against Admiral Farragut Academy on November 20, 2015, at Jefferson High School (a public school field); and (3) against First Baptist Academy on November 27, 2015, at Skyway Park.  A-13458 (¶36); A-11914-15 (¶16), A-13363 (¶17); A-11949 (¶20).  Greg Froelich was the PA announcer for CCS's playoff games, and for each game he read FHSAA's PA script.  A-11951 (¶22); A-11960; A-11803 (Tr.24:16-19); A-11180 (Tr.111:10-12).  Froelich, while standing next to an FHSAA game official in the PA booth, also led an unscripted prayer over the loudspeaker at each game.  A-11948-51 (¶¶16, 23); A-11906 (¶11); A-13363 (¶17); A-11914 (¶16); A-11938 (¶24).

### E.    FHSAA's Adoption of the Prayer Ban Before the 2015 Championship Game

After playing (and praying) its way through the 2015 FHSAA playoffs, CCS made the championship game, where it faced University Christian—the school whose request to pray over the loudspeaker FHSAA approved in 2012.   On December 2, 2015, in the lead-up to the game, CCS's Head of School emailed FHSAA's then-Executive Director, Dr. Roger Dearing, asking FHSAA to "allow two Christian schools to honor their Lord before the game and pray ... over the loud speaker."  A-12602.  Euler requested this because it would allow for "communal prayer in a stadium that size" and for "families and students to celebrate the time together with a prayer."  A-11738, 11753 (Tr.41:15-21, 98:15-16).  UCS's head of

school offered "full support of having Mr. Euler pray before our competition over the loud speaker" and said the issue was of "utmost importance." A-12604.

Dearing denied the request, announcing a new policy:

> Although both schools are private and religious-affiliated institutions, the federal law addresses two pertinent issues that prevent us from granting your request. First is the fact that the facility is a public facility, predominantly paid for with public tax dollars, makes the facility "off limits" under federal guidelines and precedent court cases. Second, is the fact that in Florida Statutes, the FHSAA (host and coordinator of the event) is legally a "State Actor", we cannot legally permit or grant permission for such an activity.

A-12607 (emphasis original).

Dearing testified that he did not consider alternatives that might make it legal, in FHSAA's view, to grant the request. A-10858 (Tr.83:18-87:17). Indeed, FHSAA banned all "artificial or mechanical noisemaking devices," making any alternative to the loudspeaker also "off limits." A-11043-44 (Tr.213:18-214:3); A-12197 (§3.1.4); A-12295 (§I.7.C); A-11659 (Tr.171:24-172:9); A-11093 (Tr.87:18-88:5).

At the game, on December 4, 2015, student-athletes, coaches, and some FHSAA game officials joined at midfield and prayed. A-955 (¶50); A-11736 (Tr.31:16-22, 32:2-9); A-11811-12 (Tr.57:17-58:7); A-11894-95 (¶12); A-12889. Because a loudspeaker's purpose is to enable everyone inside a stadium to hear announcements, A-10991-92 (Tr.109:20-110:14), A-11038 (191:22-192:25), A-11521 (Tr.194:10-19), and because no prayer was delivered over the loudspeaker, CCS and UCS community members were unable to hear and join in the teams'

prayer.  A-11894-95 (¶12) (UCS principal stating she could not hear or participate in the communal prayer from the fourth row of the stands).  As one CCS player's mother, who was in the stands that day, explained:

> Because the prayer was not offered over the public-address system, I was unable to pray with my son Jacob before the game, unable to pray with all the Cambridge Christian fans and community members in attendance, and unable to join with fellow Christians from University Christian School in asking God's blessing and protection during the game.

A-13364 (¶20).  *See also* A-11914-15 (¶¶13, 18) (player's father stating "I was unable to carry out my religious belief in communal prayer").  Her son likewise explained: "I was unable to pray together with my parents who were in the stands.  I was also unable to join with Cambridge Christian friends and fans supporting both teams in praying for God's protection and blessing in the game."  A-11908 (¶16).  Players were "frustrated and confused, feeling like the FHSAA's decision sent a message that it was wrong for us to use the public-address system so that we could pray together as two Christian school communities."  *Id.* (¶14).

Froelich, in the stands that day, attempted to lead a communal prayer with his unamplified voice.  Because of the size of the stadium and crowd noise, he could not be heard by most others in the stands or on the field.  A-11953-55 (¶¶30, 33-37); A-11915 (¶17); A-13363-64 (¶18); A-11939 (¶29).

On December 7, 2015, after the game had been played, Dearing emailed the schools to further explain the reasoning behind FHSAA's new Prayer Ban.  He stated

the "issue is commonly referred to as the 'separation of church and state'" and that the "First Amendment … contains a provision that prohibits government from 'establishing' a religion," which means "government may not engage in activities that can be viewed as endorsing or sponsoring religion." A-12611. Dearing maintained: "[i]t is simply not legally permitted under the circumstances … requested by Mr. Euler." *Id.* Dearing offered no other reason for the Prayer Ban, and FHSAA's contemporaneous documents state that the decision was solely "based on" FHSAA's reading of a Supreme Court Establishment Clause case. A-12798.

After implementation of the Prayer Ban, FHSAA activated a public relations and lobbying team to "spin" the decision because CCS had "made a huge stink" about it. A-12798; A-13420. "The goal … [was] to respond, move on and hope that it's over." A-13423.

## F.    FHSAA Routinely Permitted and Broadcast Prayers and Religious Messages at Its Events and Over Its Platforms

Aside from its newfound concern in 2015 regarding prayers over the loudspeaker during a championship game, FHSAA has *never* expressed a concern, much less prohibited, the substantial volume of religious speech found at its events and on its communications channels. For example, at the 2012 FHSAA Class 2A Football Championship Game—just after the National Anthem, and as the PA announcer announced the UCS starters—the UCS team ran through a banner held by UCS cheerleaders. A-11233 (Tr.12:17-20); A-4295. The banner prominently

displayed the team's season motto: "One Victory One HeartBeat One God."  UCS cheerleaders held the banner on the goal line of an end zone emblazoned with the large letters "FHSAA," and the banner was visible to spectators at the game:



A-12801-53;  A-11233-34  (Tr.11:25-16:15);  A-11501-02  (Tr.117:3-14,  121:4-122:5); A-11893 (¶¶7, 8).  FHSAA did not review or approve, and did not prohibit, this on-field religious display, and it deemed this banner to be "a message from whomever created the banner," not FHSAA.  A-11234 (Tr.14:5-6, 16:16-20, 17:5-12).

In another example, during the post-game of the 2015 Class 2A final (the game that gave rise to this lawsuit), FHSAA permitted its broadcaster to televise a UCS player during an on-field interview organized by FHSAA.  The player said: "I can't do it without God giving me the ability to do all these things."  A-4240 (¶35).  Likewise, in 2018, at the Class 7A football championship game, participating players and coaches from Lakeland High School gathered near the wall separating the field

from the stands and said a prayer. FHSAA broadcasted that prayer live on its Facebook page. A-4240 (¶36).

FHSAA also maintains social-media accounts, and uses these accounts as a "forum to communicate with [FHSAA] constituents" and "promote what we do." A-12045-49 (RFAs 146-66); A-11077 (Tr.24:23-25:3); A-11460, A-11495 (Tr.41:14-25, 92:13-25). FHSAA considers social-media posts to be messages from FHSAA to its "fan base." A-11461 (Tr.42:11-22); A-11569 (Tr.35:12-14). FHSAA has the PA announcer encourage spectators at games to visit these social-media accounts. For example, the PA script for the 2015 Class 2A football final included the following:

> **29.  FHSAA ON FACEBOOK/TWITTER**
>
> THE F-H-S-A-A IS ON FACEBOOK AND TWITTER!  GO TO FACEBOOK DOT COM SLASH F-H-S-A-A AND BECOME A FAN AND FOLLOW ON TWITTER AT F-H-S-A-A! YOU CAN KEEP UP WITH HIGH SCHOOL ATHLETICS AROUND THE STATE OF FLORIDA AND THE COACHES AND ATHLETES THAT KEEP FLORIDA AMONG THE NATION'S ELITE. BE A FAN OF IT ALL!

A-4318.

A fan who follows the PA announcer's cue will find that FHSAA often posts religious messages, including prayers, on social media. FHSAA's social-media accounts over the last decade featured these posts, among others:









A-4241 (¶39); A-12045 (RFAs 146-59); A-12873-88.

## G.    Loudspeaker Prayer at Post-2015 FHSAA Playoff Games

Although FHSAA has refused to rescind the Prayer Ban and defended the policy for the last seven years, it has simultaneously permitted loudspeaker prayers to continue at SCS playoff games.  In 2020, CCS again made the SCS, and each of

its playoff games—both against Christian schools, and one played on a public high school's field—were preceded by loudspeaker prayer.  A-11899 (¶¶10-11); A-11955-56 (¶¶40-41).  Likewise, University Christian continued its tradition of praying over the loudspeaker at each of its 2020 playoff games.  A-11892-95 (¶¶3, 13-14).

## H.    FHSAA Transmitted Solemnizing Messages over the Loudspeaker

Despite the Prayer Ban, FHSAA has often included solemnizing moments of silence and "silent reflection" in PA scripts.  A-4254-55 (¶89 & n.23).  PA scripts have included moments of silence: "for those who have sacrificed for us to enjoy the freedom we have"; in memory of an athletic director and a cross-country coach; and in memory of an athletic director and principal.  A-4910; A-6586-87; A-6532.  Some of these moments of silence appeared in 2015 PA scripts.  A-11172 (Tr.79:3-7); A-6516; A-6532; A-6586-87; A-6648; A-6670.

In 2018, FHSAA included a version of the following in more than thirty PA scripts:

12

LADIES AND GENTLEMAN, PLEASE STAND AND REMOVE COVER.

*[pause]*

AS WE STAND HERE TODAY, *[home team]*_____;

*[visiting team]*_____; ALONG WITH THE FLORIDA HIGH SCHOOL ATHLETIC ASSOCIATION AND ITS MEMBERS, TOGETHER WITH THE ENTIRE STATE OF FLORIDA AND THIS GREAT COUNTRY, MOURN THE SENSELESS LOSS OF LIFE FOLLOWING THE FEBRUARY 14TH TRAGEDY AT MARJORY STONEMAN DOUGLAS HIGH SCHOOL. AT THIS TIME, LET'S JOIN TOGETHER IN A MOMENT OF SILENT REFLECTION IN HONOR OF THE LIVES LOST AND ALL THOSE AFFECTED.

*[20-30 second pause]*

THANK YOU. YOUR POSITIVE THOUGHTS FOR MARJORY STONEMAN DOUGLAS HIGH SCHOOL ARE APPRECIATED.

PLEASE REMAIN STANDING AS WE HONOR AMERICA AND THOSE WHO RISK THEIR LIVES TO DEFEND OUR FREEDOM WITH THE PLAYING OF OUR NATIONAL ANTHEM.

*National Anthem is performed.*

NOW, LET'S PLAY SOCCER!

*[Proceed with call of game.]*

2018 F-H-S-A-A BOYS SOCCER FINALS
PA SCRIPT

A-10424. *See also* A-11164-65 (Tr.49:16-50:3). FHSAA's purposes in leading fans and athletes in these moments of silence included "saying we're … unified as a people in this building to mourn the senseless loss of life," and to honor and recognize individuals. A-11167-74 (Tr.60:3-6, 70:3-8, 71:4-11, 87:12-16). Regarding these PA prompts, FHSAA testified it did not know of any difference between calling for positive thoughts and calling for a prayer. A-11167-68 (Tr.61:24-62:15). Yet, FHSAA testified it would "probably not" permit a moment

of silence to recognize God. A-11172-73 (Tr.81:22-82:4, 82:20-84:7). The reason FHSAA would permit a moment of silence for a person and not God is because persons are "known entities" and "easily identifiable specific individuals" that "other people know about." A-11173-74 (Tr.84:8-20, 87:1-11).

In addition to prompts for moments of silence and positive thoughts, many FHSAA PA announcements concern themes similar to those in CCS's prayers. For example, dozens of PA scripts contain messages extolling "hard work, perseverance and dedication." *See, e.g.*, A-11951 (¶ 22); A-11960; A-5145; A-4602. Many PA scripts: stated "we all lose when all we care about is winning, when we're not kind to one another in competition"; included messages promoting "kindness," asking fans to "love one another"; and stated, "Let's be kind to each other and treat one another with respect. We are all [mascot of visiting school]. We are all [mascot of home school]. We are all Floridians. We are all fans. We are all human!" *See, e.g.*, A-8860; A-8943; A-9461; A-9778-79; A-9794. FHSAA testified that these were "message[s] about ethical behavior." A-11184-85, A-11189 (Tr.129:8-21, 131:19-22, 146:16-147:15, 148:16-19). Many other scripts asked the crowd to provide honor, recognition, and thanks. *See, e.g.*, A-7772; A-8311. Still other scripts asked the crowd to recite an "oath." A-10400; A-11182 (Tr.120:14-22). In testimony, FHSAA was unable to explain how an oath differs from a prayer. A-11175 (Tr.92:5-7).

21

## I.     Private Speech at State Championship Series Events

FHSAA and other speakers use various modes of expression at SCS events, including speech over the loudspeaker, messaging on signs and banners, digital and video messages displayed throughout the venue, music, dancing, press interviews, and more.  A-4245 (¶54).  FHSAA recognizes that not all the speech conveyed inside the stadium at SCS events is government speech.  A-4245 (¶55).  The following is a survey of the types of private speech at SCS events.

### 1.     Private Speech over the Loudspeaker

As noted, FHSAA does not employ or select the PA announcer at *any* FHSAA football game (regular season, playoffs, or finals).  For example, the PA announcer at the 2015 Class 2A football final was not employed, hired, paid, or selected by FHSAA.  A-12916; A-11021-22 (Tr.125:22-126:6); A-10787 (Tr.146:22-24); A-13011.

FHSAA prepares detailed PA scripts for all SCS events, both playoffs and finals.   A-11457 (Tr.28:19-29:17); A-11034 (Tr.175:23-176:3); A-4292-10744.  While these scripts contain copy to be read by the PA announcer, the loudspeaker at SCS events is not used exclusively by the PA announcer or exclusively for FHSAA speech.

First, some scripts contain explicit prompts for school speakers.  A-4292; A-8588; A-8802; A-9227; A-9427; A-10204.   In its corporate deposition, FHSAA

testified that it turns the loudspeaker over to school representatives to give welcoming remarks **"periodically often"** and does not review or approve those remarks in advance.  A-11177 (Tr.99:16-20, 100:4-11).

    <u>Second</u>, at FHSAA championship football games, including in 2015, school bands and cheerleading squads performed at halftime, using the loudspeaker. FHSAA did not review, edit, or preapprove the music the schools performed, and schools could play songs with overt religious messages such as "Ave Maria," "Battle Hymn of the Republic," or "Little Drummer Boy."  A-11036 (Tr.184:8-185:9); A-11097 (Tr.102:23-103:10, 103:17-25); A-12228 (§4.7.2.5.4(c)); A-12295, 12316-17; A-12040-44 (RFAs 126, 142-43).  Moreover, schools participating in football championships, including at the Citrus Bowl in 2015, could use their own PA "half time announcer" to accompany their performance with amplified speech, and this person could be "anybody the team designated," and "sometimes the whole halftime show they'd be speaking."  A-12317 (2015 football finals Participant Manual asking school if it will "have a half-time announcer"); A-11098 (Tr.108:24-109:6); A-11412 (Tr.131:15-132:20); A-11647 (Tr.123:14-124:3); A-13008 ("Port St. Joe has a separate band announcer.").  FHSAA did not select, review, edit, or approve any speech or messages made by schools' halftime PA announcers.  A-12045 (RFAs 144-45); A-12316-17.  FHSAA considers school halftime performances to be

expression of the band, band members, band director, or the school, but not of FHSAA. A-11036 (Tr.185:10-15).

During halftime of the 2015 Class 2A final game, CCS's cheerleading team performed on the field to music of its choosing, and FHSAA did not review, edit, or preapprove that music. A-11710-11 (Tr.17:20-23, 20:12-18); A-11750 (Tr.86:12-14, 87:8-13, 87:20-22); A-955 (¶54); A-12041-43 (RFAs 130-139); A-11097 (Tr.104:22-105:1). To play the music, CCS's coach entered the PA booth, where her phone was plugged into the Citrus Bowl's PA system. A-11711 (Tr.20:23-21:25).

Third, even when the PA announcer is reading from the FHSAA script, those scripts often contain messages delivered on behalf of an entity other than FHSAA. *See, e.g.*, A-4316 ("The Central Florida Sports Commission and the City of Orlando would like to thank…."); A-6936 ("On behalf of the beaches of Fort Myers and Sanibel … welcome to our tropical island getaway!"); A-9215 ("On behalf of Boca Raton High School … welcome….").[3]

---

[3] Additionally, many PA scripts from 2014 to 2019, including scripts for multiple football championship games, direct the PA announcer to "improvise." *See, e.g.*, A-4246 (¶59). Scripts also instruct PA announcers to play music, seemingly leaving the music choice to the announcer's discretion. *Id*.

FHSAA also routinely accepted promotional script copy from sponsors without editing it.  A-11505 (Tr.132:8-12).[4]  The following table traces examples of how copy went from sponsor to script without FHSAA editing:

| Sponsor | Document | App. |
|---|---|---|
| Nike | Contract entitling Nike to announcement | A-13033-38 |
| | Nike email with script copy | A-13039 |
| | PA script with copy as transmitted by Nike | A-9304 |
| Resilite | Contract entitling Resilite to announcement | A-13023 |
| | Resilite email with script copy | A-13025 |
| | FHSAA email instructing inclusion of script copy | A-13030 |
| | PA script with copy as transmitted by Resilite | A-6838 |
| Pinch-a-Penny | Contract entitling Pinch-A-Penny to announcement | A-13044 |
| | Pinch-a-Penny email with revised script copy | A-13052 |
| | FHSAA email about script revisions | A-13055 |
| | PA script as revised by Pinch-A-Penny | A-6311 |

Both FHSAA in its corporate capacity and individual FHSAA officials testified that FHSAA does not consider all script copy read by the PA announcer to be FHSAA's speech.  A-11182, A-11187 (Tr.120:14-17, 139:9-12); A-11504-06

---

[4] FHSAA even allowed sponsors to promote causes other than their own business.  For example: "Hudson Pump and Equipment asks fans to give generously to VISTE, Volunteers in Service to the Elderly, and LVIM, Lakeland Volunteers in Medicine."  A-5838; A-6127; A-9682-83; A-10023-24.

(Tr.126:3-9,   131:3-132:4,   135:21-22);   A-11580   (Tr:81:8-11);   A-10903-05 (Tr.55:25-56:1, 56:18-25, 62:18-20); A-11407-08 (Tr.112:6-18, 114:17-19).

The script FHSAA prepared for the 2015 Class 2A championship football game provides a good example.  It included several announcements from corporate sponsors, the rights to which the sponsors purchased, and the purpose of which was for the sponsors to promote themselves.  A-4309-25; A-12050-51 (RFAs 171-72), A-12928; A-10899, A-10922 (Tr.39:21-25, 131:8-14); A-11575 (Tr.51:7-10).  Many sponsor announcements did not mention FHSAA, *see, e.g.*, A-12959, nor was there a requirement to do so,  A-10899 (Tr.40:6-11). The sponsorship agreements gave sponsors the right to the PA announcement but did not reserve to FHSAA the right to draft or modify those announcements.  A-12933-42 (Bright House); A-12946, A-12955 (Champion); A-12960, A-12964   (Gatorade); A-12972-84 (Balfour); A-12986, A-12992 (Pinch-a-Penny); A-12994-95 (Spalding); A-12998, A-13005 (Sports Authority[5]).

FHSAA permitted sponsors to draft their own 2015 PA script messages, and FHSAA employees considered these script portions to be speech of the sponsors, not FHSAA.  The following table matches the 2015 PA script sponsor messages with FHSAA testimony stating those messages were the sponsor's speech:

---

[5] Conversely, the Sports Authority agreement *did* grant FHSAA the right to approve sponsor content for social-media promotions. *Id.*

| 2015 Class 2A Final PA Script Paragraph | Testimony |
|---|---|
| ¶1 Team IP | A-10903 (Tr.54:13-55:7) |
| ¶2 Bright House | A-10903 (Tr.55:25-56:1) |
| ¶15 Champion | A-10903 (Tr.56:18-20, 56:24-25) |
| ¶20 Gatorade | A-10904 (Tr.58:3-8); A-11408 (Tr.114:17-19) |
| ¶23 Champion | A-10904 (Tr.61:13-16) |
| ¶24 Pinch-a-Penny | A-10905 (Tr.62:18-20) |
| ¶28 Spalding | A-10905 (Tr.63:1-6) |
| ¶32 Sports Authority | A-10905 (Tr.63:8-21) |
| ¶23 Champion | A-11408 (Tr.116:14-20) |
| ¶28 Spalding | A-11408 (Tr.117:24-118:3) |

FHSAA considered other portions of the script to be its own speech, as illustrated by the following table matching script sections with FHSAA testimony:

| 2015 Class 2A Final PA Script Paragraph | Testimony |
|---|---|
| ¶3 "Sportsmanship" | A-11405 (Tr.104:11-18); A-11040 (Tr.198:7-23); A-11164 (Tr.47:21-23); A-11504 (Tr.126:15-21); A-10897 (Tr.30:2-20) |
| ¶6 "Welcome to Orlando" | A-11406 (Tr.107:19-21) |
| ¶19 "F-H-S-A-A Website" | A-11407 (Tr.113:20-21) |
| ¶25 "Officials Recruitment" | A-11408 (Tr.117:3-4) |
| ¶29 "FHSAA On Facebook/Twitter" | A-11401 (Tr.87:13-19) |
| ¶40 "Sportsmanship" | A-10896 (Tr.26:3-18) |
| ¶50 "So Long, Farewell" | A-11505, 11515 (Tr.130:19-131:2, 162:11-14, 163:6-164:2); A-11401 (Tr.123:3-17); A-11586 (Tr.103:9-13, 104:9-10) |

Per the FHSAA 2015 Class 2A finals script, the PA announcer introduced the color guard, led the Pledge of Allegiance, and introduced the National Anthem. A-4511. FHSAA did not select the National Anthem performer, A-12228

27

(§4.7.2.5.4(b)), A-13011, A-11655 (Tr.157:1-20, 159:2-10, 160:18-161:20), A-13369, A-13372, A-11512 (Tr.159:21-24), and did not consider the performance to be its own speech, A-11037-38 (Tr.189:21-190:9).

The seventeenth announcement in the 2015 Class 2A Final PA script was entitled "Local Sponsors." A-4316.  The FHSAA-CFSC agreement permitted CFSC to solicit sponsors, subject to FHSAA approval and compatibility "with the educational dignity and propriety of" FHSAA.  A-12731 (§14.b(2)).  Yet FHSAA never actually reviewed local sponsors for this reason.  A-10909 (Tr.78:13-79:15).  CFSC, not FHSAA, drafted the "Local Sponsors" announcement, and FHSAA considered this announcement to be a message from CFSC, not FHSAA.  A-10905-06 (Tr.65:20-66:9); A-11407 (Tr.111:2-18); A-11103 (Tr.126:3-9).

### 2.    Cheerleaders Along the Sidelines

At SCS games, school cheerleaders perform along the sidelines.  A-12293 (§I.6.B.e); A-11709-10 (Tr.15:19-22, 18:20-25); A-13229.   FHSAA does not prescreen or approve the cheers performed, and FHSAA considers those cheers to be school speech, not FHSAA speech.   A-11037 (Tr.187:21-188:7); A-10785 (Tr.140:22-141:4).

### 3.    On-field Coach/Player Media Interviews

For football SCS games, FHSAA mandates that each head coach participate in on-field media interviews, and it permits players to do the same.  FHSAA deems

comments made during those interviews to be interviewee, not FHSAA speech.  A-4251 (¶76).

4.    Sponsor Speech through Signs, Videos, and other Promotions

Sponsor speech at SCS events is not limited to PA announcements.  It permeates the stadium: sponsor-created videos (without FHSAA editing) broadcast on stadium video screens; sponsor-designed banners (without FHSAA editing) hung adjacent to FHSAA banners; sponsor-created logos (without FHSAA editing) displayed on the field; and sponsor promotional booths along the stadium concourse. FHSAA does not consider any of this speech to be its own.  A-4251-52 (¶¶77-81); A-13229.

5.    Fan Signs and Banners

In addition to private speech from schools and sponsors, SCS events also feature a range spectator speech.  FHSAA allows spectators to display homemade signs and banners in the stadium during the game.  A-4252 (¶82).  This occurred at both the 2012 and 2015 FHSAA Class 2A football finals.  Some banners were draped over the railing and onto the lower-bowl wall, including adjacent to sponsor and FHSAA banners.  A-4253 (¶83).  FHSAA did not edit any spectator signage displayed at football championship games in 2015, and FHSAA considered these fan signs to be private speech.  A-4253 (¶84).  These fans signs could have religious

messages such as "Lord, be with our team," "Be good Christians," or "John 3:16." A-11042 (Tr.204:6-207:19); A-11244 (Tr.54:16-19).

6.     Speech with Which FHSAA Did Not Want to Associate

Some private speech permitted or suffered by FHSAA at SCS events, including over the loudspeaker at the 2012 and 2015 Class 2A football finals, was speech with which FHSAA did not want to associate. For example, one local sponsor listed in the 2015 Class 2A PA script was Hooters. A-4316. Hooters' business model promoted "vicarious sexual recreation." A-4253 (¶86). "Vicarious sexual recreation" is not something with which FHSAA wanted to associate. A-10909-10 (Tr.90:14-19). Yet, despite its right to reject local sponsors, FHSAA did not reject inclusion of Hooters in the PA script. A-10909-10 (Tr.81:25-82:18); A-11190 (Tr.149:16-151:25).

FHSAA also did not want to associate with alcohol. It "strictly prohibited" alcoholic beverages at football finals, prohibited CFSC from engaging "alcoholic beverage companies" as local sponsors, and would not itself have an alcohol company as a sponsor because it "had a responsibility [for] no alcohol, drugs, tobacco products, so on, so forth." A-12295 (§I.7.C); A-12569 (§I.7.C); A-12731 (§14.b(2)); A-10862 (Tr.98:18-21); A-11240 (Tr.38:7-9, 39:3-6, 39:14-25). Yet, at the 2012 and 2015 Class 2A finals, advertisements for alcohol were prominently displayed inside the Citrus Bowl, directly adjacent to FHSAA signage. A-4254 (¶87

& n.22); A-12731 (§14.b.(2)).  For example, the scoreboards at Class 2A finals in 2012 and 2015 appeared as follows:

 

A-13138; A-13216.

## II.   COURSE OF PROCEEDINGS

In September 2016, CCS filed suit in the U.S. District Court for the Middle District of Florida, alleging FHSAA's Prayer Ban violates the free-speech and free-exercise guarantees of the U.S. and Florida constitutions, and seeking declaratory and injunctive relief.  The Complaint also alleged the Prayer Ban violates Florida's Religious Freedom Restoration Act, and sought a declaratory judgment that the Establishment Clause does not require the Prayer Ban.  A-206.

CCS moved for a preliminary injunction.  A-427.  FHSAA's then-Executive Director, Dr. Dearing, submitted a declaration "based upon … review of the business records of FHSAA."  A-643 (¶2).  Dearing cast doubt on whether schools had used the Citrus Bowl loudspeaker for a pre-game prayer in 2012, claiming he never approved it.  A-645 (¶12) ("If University Christian previously engaged in a pre-game

31

prayer over the stadium's public-address system, it did so without my permission."). The district court denied CCS's preliminary-injunction motion and granted FHSAA's motion to dismiss.  A-802; A-866.

CCS appealed, and this Court reversed in part.  *Cambridge Christian School, Inc. v. Florida High School Athletic Association, Inc.*, 942 F.3d 1215 (11th Cir. 2019) (hereinafter "*CCS*").  This Court held CCS had "plausibly allege[d] violations of the Free Speech and Free Exercise Clauses of the United States and Florida Constitutions" and noted discovery would shed further light on several critical issues.  *Id.* at 1234, 1242 n.8, 1246, 1252.

On remand, CCS pursued this discovery.  In addition to critical testimony from FHSAA and its leadership, CCS—after a long delay and the imposition of sanctions for withholding documents, Doc. 125, A-13237—obtained from FHSAA hundreds of PA scripts, as well as photos and videos of the football finals.

The parties filed cross motions for summary judgment.  A-2598, A-4227; A-13244; A-13282 (errata sheet); A-13379; A-13425; Doc.155.  CCS filed multiple volumes of discovery in support of its briefs, including appendices of deposition transcripts (A-10745); PA Scripts (A-4274); and other exhibits such as FHSAA emails, sponsor contracts, and game photos (A-11883).  On March 31, 2022, the district court granted summary judgment in FHSAA's favor and entered final judgment.  A-13461; A-13499.  This appeal followed.

After final judgment issued, FHSAA—the state actor—indicated it will seek to have Cambridge Christian School pay FHSAA's attorneys' fees. *See* Doc. 169. That issue is deferred pending disposition of this appeal. Doc. 176.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court "reviews the district court's disposition of cross-motions for summary judgment de novo, applying the same legal standards used by the district court, viewing the evidence and all factual inferences therefrom in the light most favorable to the non-movant, and resolving all reasonable doubts about the facts in favor of the non-moving party." *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

## SUMMARY OF ARGUMENT

The First Amendment "doubly protects religious speech" through its free-exercise and free-speech guarantees. *Kennedy*, 142 S.Ct. at 2421. The Prayer Ban violates both protections.

The Prayer Ban violates CCS's free-exercise rights because it is neither neutral nor generally applicable. FHSAA's sole reason for implementing the Prayer Ban was the religious nature of CCS's speech. FHSAA permits private speech over the loudspeaker, and it permits secular speech on the topics covered in CCS's

prayers. Because this ban so obviously runs afoul of free-exercise guarantees, FHSAA's only argument, embraced by the district court, is that CCS does not sincerely practice pre-game communal prayer over the loudspeaker. That contention is untrue, but also irrelevant. It is untrue because the undisputed record shows CCS has engaged in loudspeaker prayer at every game it has ever played against a Christian school and at every SCS game it has ever played (save for the 2015 final). It is irrelevant because it is for a religion, not a court, to define its religious practices, and those practices "merit First Amendment protection" even if "not .... logical, consistent, or comprehensible to others." *Fulton*, 141 S.Ct. at 1876.

The Prayer Ban violates CCS's free-speech rights because, as just mentioned, it is based on viewpoint. Moreover, even if the ban were not based on viewpoint, its arbitrary and inconsistent enforcement renders it impermissible. FHSAA's only defense, again embraced by the district court, is that all loudspeaker speech is government speech. But the record shows that FHSAA "periodically often" turned the loudspeaker over to schools for pre-game welcoming remarks, that it permitted schools to have an unscripted halftime PA announcer, and that it permitted sponsors to have unedited promotional messages read over the loudspeaker. This "case's context," *Shurtleff*, 142 S.Ct. at 1589—now on a fully developed record—shows that the loudspeaker is not a forum for only government speech.

**ARGUMENT**[6]

## I.    THE PRAYER BAN VIOLATES CCS'S FREE-EXERCISE RIGHTS.

This past Term, the Supreme Court reaffirmed that the Free Exercise Clause protects not just religious faith but also "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of … physical acts.'" *Kennedy*, 142 S.Ct. at 2421 (quoting *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990)).  A plaintiff may "prov[e] a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"  *Id.* at 2421-22 (quoting *Smith*, 494 U.S. at 879-81).  Such a policy "must undergo the most rigorous of scrutiny" and "is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest."  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 546 (1993); *see also Kennedy*, 142 S.Ct. at 2422 (same).  Here, FHSAA's Prayer Ban is targeted at religion and is not supported by a compelling justification or narrow tailoring.

### A.    CCS's Communal Prayers Are a Sincere Religious Practice.

Communal prayer is a sincere religious practice that permeates life at CCS. Communal prayer is conducted during morning announcements over the PA system;

---

[6] Florida's free-exercise and free-speech rights are treated identically to the federal rights, and thus the argument below applies equally to CCS's state law claims.  *See CCS*, 942 F.3d at 1228 n.2.

in the classroom; on the athletic fields; and at performing arts events, staff meetings, trustee meetings, graduations, and just about every other gathering of all or a portion of the CCS community. *See, e.g.,* A-4233-34 (¶¶1-6); A-13361-63 (¶¶8-15); A-11818 (Tr.84:11-23). This religious practice is a manifestation of deeply held religious belief. As CCS's Head of School, Shawn Minks, testified: CCS "believes that communal prayer stimulates the spiritual growth of students, develops in them a biblical world and life view, teaches them to perceive God's work in all areas of their lives, and generates spiritual renewal." A-11934 (¶9). Greg Froelich, a CCS parent and volunteer PA announcer, explained:

> Our sacred text, the Holy Bible, teaches that God listens to our communal prayers. For example, Matthew 18:20 states: "For where two or three are gathered in my name, there am I among them." I believe that the presence of God is even more fully realized when larger groups pray together.

A-11953 (¶31). Thus, in his 2015 request, then Head of School Euler put it very simply: "I am requesting … that the [FHSAA] allow two Christian schools to honor their Lord before the game and pray … over the loudspeaker." A-12601.

This undisputed record is more than sufficient to demonstrate the sincerity of CCS's belief in and practice of communal prayer. *CCS*, 942 F.3d at 1248-49 (noting it is not a court's job to define for religion its sincerely held beliefs). Yet the district court rejected CCS's free-exercise claims *solely* because it concluded prayer over the PA system was not a "long-standing practice and tradition for CCS" and was

36

thus a mere "preference of CCS's" that does not "rise[] to the level of a sincerely held belief." A-13494, A-13496. The district court erred both factually and legally.

As a factual matter, to reach its conclusion, the district court cited an email noting two regular-season away games at which CCS did not request to pray over the PA system in deference to a non-religious school's tradition on its own field. A-13494. But these sparing examples—most of CCS's games are against religious schools—hardly justify the district court's conclusions that CCS had a "routine practice" of not using the loudspeaker for communal prayer or that "communal prayer over a PA system is not the typical practice at events not hosted by CCS or not occurring on CCS's campus." A-13493, A-13495. To the contrary, the record is undisputed that CCS has engaged in communal prayer over the loudspeaker *every time* it has played another Christian school (other than the 2015 final) and *every time* it is been in an SCS game (other than the 2015 final). Most of these SCS games occurred at publicly owned stadiums deemed neutral sites by FHSAA policy.

As a matter of law, even if the district court had accurately characterized the facts, it would not matter one iota. "The question of what is a 'religious' belief or practice … is not to turn upon a judicial perception of the particular belief or practice in question." *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981). "'Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'" *Fulton*,

141 S.Ct. at 1876 (quoting *Thomas*, 450 U.S. at 714).  Thus, even if CCS's religious practice of communal prayer over the loudspeaker had originated when the school made the 2015 request,[7] that fact would not strip CCS of its constitutional protections against religious discrimination.  *See Kennedy*, 142 S.Ct. at 2422-23 (granting free-exercise claim of coach who had recently altered his practice of prayer from communal to individual).

For this same reason, the district court also erred by defining communal prayer for CCS rather than allowing CCS to define it for itself.  The court concluded that "CCS and … UCS were allowed to, and did, pray together at midfield…. Thus, the issue was not that the schools, their students, or their fans were precluded from praying; the issue … is they were not given access to the microphone…." A-13493. CCS believes that communal prayer must be heard by the entire gathered community, and it is undisputed that CCS community members in the stands could not hear the unamplified midfield prayer, nor even Froelich's shouted prayer from within the stands.  Thus, CCS did *not* "pray together" at the game—at least in CCS's view, which is the only one that matters.  It "is not within the judicial function and

---

[7] A religious school would have good reason to want to pray at the *championship* game because, as FHSAA itself maintains, for "student athletes … coaches and spectators in attendance, [the championship game] is one of the most memorable experiences of their lives."  A-12928; A-11021, A-11042 (Tr.122:8-123:14, 208:15-209:20).  No one has questioned that Mr. Euler's email of December 2, 2015, was a sincere (as opposed to a pretextual) request to engage in a religious practice.

judicial competence" to say a particular practice is "close enough," *Thomas*, 450 U.S. at 716, and the "Free Exercise Clause does not permit the State to confine religious speech to whispers, *Chandler v. Siegelman*, 230 F.3d 1313, 1316 (11th Cir. 2000).

**B.    The Prayer Ban is Neither Neutral nor Generally Applicable.**

"A government policy will not qualify as neutral if it is 'specifically directed at … religious practice.'" *Kennedy*, 142 S.Ct. at 2422 (quoting *Smith*, 494 U.S. at 878). FHSAA made clear in 2015 that the "pertinent" reason for its denial was the religious nature of the request because "the government may not engage in activities that can be viewed as endorsing or sponsoring religion." A-12607; A-12611. Accordingly, FHSAA barred CCS's "actions … because of their religious character," and the prohibition was therefore "not neutral." *Kennedy*, 142 S.Ct. at 2422-23; *see also Masterpiece Cakeshop*, 138 S.Ct. at 1731 ("The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion.") (quoting *Lukumi*, 508 U.S. at 534)).

The Prayer Ban "also fail[s] the general applicability test." *Kennedy*, 142 S.Ct. at 2423. By its own admission, FHSAA permits schools to make welcoming remarks over the PA system "periodically often," A-11177 (Tr.99:16-20, 100:4-11), and permitted schools to use the loudspeaker at halftime, *supra* pp.23-24. FHSAA also permits sponsors to convey all kinds of promotional messages over the PA

system, and many such messages were included in the 2015 Class 2A final PA script. A-4309-25.  FHSAA thus had no hard-and-fast bar on use of the PA system for school or sponsor speech, but instead developed an impermissible "bespoke requirement" for CCS's religious speech.  *Kennedy*, 142 S.Ct. at 2423; *see also Intervarsity Christian Fellowship/USA v. University of Iowa*, 5 F.4th 855, 864 (8th Cir. 2021).

Moreover, a policy "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S.Ct. 1877.  Thus, while FHSAA now cites the purpose of the forum as an excuse for the Prayer Ban, FHSAA has repeatedly used the loudspeaker to call for moments of silence, including dozens of times in 2018 when it asked for long moments of "silent reflection" and "positive thoughts." *See supra* pp.19-21.  Yet, even though it could not cite a meaningful difference between calling for positive thoughts and calling for prayer, FHSAA would not allow the exact same message if it invoked God.  *Supra* pp.20-21.  Likewise, FHSAA uses the PA system to deliver messages about ethical behavior, sportsmanship, kindness, and to honor individuals—all themes of CCS's banned prayers.

Finally, Dearing's explanation that use of "public tax dollars" renders the stadium loudspeaker "off limits," A-12607, was wrong.  Because the stadium is open to private schools—and its loudspeaker is open for private messages, including from

schools and sponsors—the Prayer Ban also violates free exercise because "it excludes religious observers from otherwise available public benefits." *Carson*, 142 S.Ct. at 1996 (citing *Espinoza*, 140 S. Ct. 2246; *Trinity Lutheran*, 137 S.Ct. 2012). Once a state decides to make a program or benefit available to private schools, "it cannot disqualify some private schools solely because they are religious" or will use the program in a religious way. *Id.* at 1997, 2001-02.

### C.    The Prayer Ban Fails Strict Scrutiny.

Because FHSAA's Prayer Ban was neither neutral nor generally applicable, it is subject to strict scrutiny. FHSAA must show that its policy serves "interests of the highest order and [is] narrowly tailored in pursuit of those interests." *Lukumi*, 508 U.S. at 546. FHSAA can show neither.

FHSAA's "only explanation for the new restriction … was that prayer was not permitted by the Establishment Clause." *CCS*, 942 F.3d at 1244. Dr. Dearing offered a long explanation of how the "issue … has been richly debated—and decided in the courts of the United States." A12894-95. He explained that the Constitution has a First Amendment that "contains a provision that prohibits the government from 'establishing' a religion," and that means "the government may not engage in activities that can be viewed as endorsing or sponsoring religion." *Id.* ("The issue was, and is, that an organization, which is determined to be a 'state actor,' cannot endorse nor promote religion."). This, of course, was the *Lemon* test.

41

*See Kennedy*, 142 S.Ct. at 2427 (the *Lemon* approach "came to involve estimations about whether a 'reasonable observer' would consider the government's … action an 'endorsement' of religion").  But the Supreme Court "long ago abandoned *Lemon* and its endorsement test offshoot." *Id.*  The "Establishment Clause does not contain anything like a 'modified heckler's veto, in which … religious activity can be proscribed' based on 'perceptions' or 'discomfort.'" *Id.* (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001)).  And the Clause does not "'compel the government to purge from the public sphere' anything an objective observer could reasonably infer endorses or 'partakes of the religious.'" *Id.* (quoting *Van Orden v. Perry*, 545 U.S. 677, 699 (2005) (Breyer, J., concurring in judgment)).  In short, a desire to avoid being "viewed" as endorsing religion is not a compelling interest.  The Free Exercise and Establishment Clauses have "complementary purposes, not warring ones." *Id.* at 2426.

As *Kennedy*'s citations of pre-2015 cases underscore, FHSAA's reliance on the Establishment Clause was legally indefensible at the time.  But it was especially specious because FHSAA's citations were "on the books when prayer was allowed in the championship game in 2012 and again in the first three playoff rounds in 2015," and the "FHSAA hasn't told us why this explanation barred speech at the 2015 championship game when it didn't bar the high schools from offering the same form of speech at three earlier semifinal games and one final game." *CCS*, 942 F.3d

at 1244. Nor has FHSAA told us why this restriction did not bar a school's cheerleaders from displaying a "One God" banner during the pregame announcement of players in 2012; did not bar FHSAA from posting "prayers" and other religious messages on its government-owned and controlled social-media accounts; and would not bar a school from playing religious music over the loudspeaker at halftime. Accordingly, FHSAA's claimed interest is not coherent, much less compelling.

Finally, even if FHSAA had met its burden on compelling interest, it made no meaningful effort to tailor its policy to otherwise allow CCS to join in a communal pregame prayer. A-4244 (¶48). For example, given that FHSAA can itself easily distinguish between its own speech and private speech over the PA system, *supra* pp.23-28, it could have simply announced that the two schools competing in the game had their own welcoming message to their communities and let the schools deliver the prayer—as requested and as occurred in 2012.

"A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. Given the lack of any attempt at narrow tailoring, this is not one of those "rare cases." The Prayer Ban violates CCS's free-exercise rights, and the district court erred in holding otherwise.

43

## II.   THE PRAYER BAN VIOLATES CCS'S FREE-SPEECH RIGHTS

As framed by this Court in its prior opinion, CCS's free-speech claims turn on (1) whether the loudspeaker featured private speech and not just government speech, and, if so, (2) whether the Prayer Ban was thus an impermissible regulation of private speech because it was based on viewpoint or was arbitrary.  On a full record, the answer to these questions is "yes."

### A.   The Loudspeaker is Not a Forum for Only Government Speech

The district court concluded that all messages conveyed over the PA system are government speech.  But the "boundary between government speech and private expression can blur when, as here, a government invites people to participate in a program." *Shurtleff*, 142 S.Ct. at 1589.  To determine if the government created "a forum for the expression of private speakers' views," the Court must conduct a "holistic inquiry … driven by a case's context rather than the rote application of rigid factors." *Id.*  Evidence that helps "guide the analysis" includes "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 1589-90.  The evidence here is overwhelming: the loudspeaker at FHSAA SCS events is not exclusively a forum for government speech.

44

1.    <u>History Brims with Private Speech over the Loudspeaker</u>

Discovery proved both of the key allegations that led this Court to find CCS had alleged facts sufficient to support a free-speech claim—namely that prayer was transmitted over the PA system at the 2012 championship game and the 2015 playoff games.  *CCS*, 942 F.3d at 1232.  Discovery also proved much more.[8]

<u>First</u>, there is no longer any dispute that a Christian school prayed over the PA system at the 2012 Class 2A Championship Game.  FHSAA specifically authorized this prayer after a participating school requested it, as reflected in the PA script that FHSAA prepared, which prompted the PA announcer to relinquish the microphone to school representatives.  *Supra* pp.9-11.

Once this evidence came to light, FHSAA shifted course, from questioning whether the prayer happened at all (per Dearing's 2015 declaration), to calling it a "mistake."  A-2625.  The district court credited this argument, calling the 2012 prayer "an aberration" permitted "in error."  But this was no mistake.  *All* of the evidence shows that FHSAA specifically approved it ***and wrote a prompt for it into the script***.  It matters little whether Dearing approved it and obfuscated in his 2015

---

[8] The district court did not discuss the "general history" of pre-game prayer, *Shurtleff*, 142 S.Ct. at 1590, but opening momentous occasions with prayer is deeply rooted in our nation's history.  *See Marsh v. Chambers*, 463 U.S. 783, 791 (1983).  The Supreme Court begins each session with the prayer "God save this Honorable Court," Congress and many legislative bodies open with prayer, and even the annual Army-Navy football game opens with prayer over the loudspeaker.  A-4232.

declaration or did not personally approve it.  FHSAA is the defendant (Dearing is long retired) and the evidence is undisputed that *someone* with authority at FHSAA approved it.

Second, there is no longer any dispute that private speakers have transmitted prayer over the PA system at playoff games.  The district court brushed this history aside, finding that, "[c]ritically, the playoff games are hosted by one of the participating schools at a venue chosen by the participating schools," whereas the final game "is held at a neutral site and is hosted by the FHSAA and its partner host, in … the Citrus Bowl."  A-13476-77.  But, per FHSAA's Administrative Policies, FHSAA imposes strict venue requirements, reserves the right to choose a venue, and dictates that playoff games "are not 'home contests' for the host schools" and must have "an atmosphere of neutrality."  A-12138-39 (§§14.1, 14.2, 14.4.2); A-12130 (§10.8.1); A-10991 (Tr.106:23-107:23).  Moreover, the "neutral" final games still have designated "home" and "away" teams.  A-12289, A-12696.  In other words, there is no difference—under official FHSAA policy—in the neutrality of SCS playoff and final games.

As for any difference in the FHSAA's official status at playoff versus final games, all games are part of the FHSAA "State Championship Series" and are governed by the same rules.  FHSAA has not pointed to one bylaw, policy, procedure, or other official document that identifies FHSAA as the "host" of

championship games in a way that differentiates its role at playoff games.[9]  The idea of FHSAA as "host" of the championship game appears to be a concept manufactured for litigation, rather than a term FHSAA actually used in practice.

The district court also dismissed the salience of playoff games because FHSAA purports not to send central office staff to those games.    A-13477.  FHSAA's attempt to distance itself from its playoff games—and what goes on at these games—is deeply misleading. The record shows that FHSAA similarly regulates all contests—playoffs and finals alike—in the uniformly named "State Championship Series,"[10] and FHSAA expects member schools to follow these regulations, on pain of "pretty serious consequences," regardless of whether FHSAA central staff is present.  *See* A-10980 (Tr.62:17-65:16), A-10755 (Tr.21:6-8).  And, at the start of each State Championship Series, an FHSAA official directs participating teams to follow FHSAA's "Playoff Host Procedures" and sends an email to "make sure there is an open line of communication between us throughout"

---

[9] Instead, FHSAA's contract for the championship game in 2015 identified the CFSC as the "host." A-12754.  *See also* A-12719 (specifying "host school district"). In 2015, "the event was technically hosted by the sports commission, the City of Orlando, Boone High School, and Orange County public schools." A-11634 (Tr.73:10-13; 96:4-21). And FHSAA's corporate designee, employees, and PA scripts refer to other entities—not FHSAA—as hosts of championship events. A-13387 (n.5).

[10] These regulations are found in FHSAA's Administrative Policies and Administrative Procedures, which govern *all* games in the SCS.  *See* A-12128, 12138-40 (§§10, 14, 15), A-12183 (§§3, 4).

the playoffs.  A-12693.  Moreover, FHSAA requires that playoff games be branded with FHSAA's name.[11] And FHSAA polices what goes on at these games because, according to its own testimony, "if a member of a school's administration violated an FHSAA policy or rule … an official might report it to us or another school, or a citizen might report that to us."  A-10987 (Tr.91:15-19); A-11290 (Tr.34:18-35:7).

FHSAA's hands-off assertion about the SCS playoffs is even more divorced from the record when looking at the PA system.  FHSAA's "public-address protocol" is the same for *all* SCS games (playoffs and finals) and deems the PA announcer a "bench official."  A-12197-98 (§3.1.8).  And FHSAA creates similar PA scripts for both playoff and final games; discovery uncovered hundreds of PA scripts that FHSAA required to be read at playoff games (in football and across sports).  A-4278-90 (summarizing playoff scripts produced in discovery).  Those scripts identified the games as FHSAA events.  For example, at the CCS playoff games in 2015, the "FHSAA 2015 FHSAA Football Championships—Regional Tournament" script's opening prompt required the announcer to say: "Welcome to (name of facility) ___ for regional tournament competition in the 2015 *F-H-S-A-A* Class ___ football championship."  A-6616 (emphasis added).  In short, FHSAA comprehensively regulates the *entire* SCS, so its decision about where to send staff

---

[11] *See* A-12197 (§3.1.7); A-6616 (PA script requiring FHSAA identification).

is indicative of lack of control—more evidence in CCS's favor—not a reason to ignore established history.

Finally, the court stated there was no "evidence that the FHSAA knew that CCS was engaging in prayer over the PA system at the playoff games." But that means little because FHSAA also claims to be "without knowledge" of what was said over the loudspeaker at the 2015 *final* game. A-12038 (RFA 121). And even if that were true in 2015—there is no evidence that it is, and FHSAA knew teams were praying in 2012—FHSAA has now been litigating this issue for ***seven years***, so it certainly knew loudspeaker prayer was happening in 2020, when both CCS and UCS prayed over the loudspeaker at *all* of the SCS playoff games.

Third, beyond prayer, the record also shows a history of the loudspeaker being used for a variety of other private speech by schools. Most importantly, FHSAA testified that it "***periodically often***" turns over the loudspeaker to school officials to offer unscreened and unscripted welcoming remarks. A-11177 (Tr.99:16-20, 100:4-11). Moreover, during halftime, including in 2015, participating schools could use their own PA "halftime announcer" to accompany the band performance with unscreened, amplified speech, and "sometimes the whole halftime show they'd be speaking." *Supra* p.23. In addition to having their own halftime PA announcer, schools could enter the PA booth and use the PA system to broadcast music of their own choosing (including religious music) to accompany cheerleader performances.

*Supra* p.23.  The district court *entirely ignored* this history, but it is quite relevant to the analysis.  *See Shurtleff*, 142 S.Ct. at 1590-91 (specific history of allowing private parties to fly own flags on city flag poles trumped any "general history" of government speech).

Fourth, every PA script contains numerous promotional messages from private sponsors.  FHSAA officials consider these messages to be the speech of the sponsor, not FHSAA.  *Supra* pp.26-27.  The district court waved this evidence away because "the overall message is specifically scripted by the FHSAA."  A-13479.  But that conclusion ignores the unrebutted documentary and testimonial evidence that FHSAA does *not* draft or edit these messages.  *Supra* p.25.  And though the court said the "question[] that left the appellate court wondering … has been answered, and it is a resounding 'no,'" it is hard to know to which question the district court referred.  Because the one question this Court asked about sponsors—whether the ads were promotional rather than mere thank-yous, *CCS*, 942 F.3d at 1234—came back as a resounding "yes."

Fifth, the PA announcer often speaks "on behalf of" someone other than FHSAA, such as host organizations or the venue, and is permitted to improvise even though he is not an employee or contractor of FHSAA.  *Supra* p.24.  The district court ignored these facts.

Sixth, all of this private speech over the PA system is consistent with speech at FHSAA events more generally. There is a healthy mix of FHSAA speech and private speech across mediums: (1) on the playing field, where FHSAA logos are intermixed with sponsor logos, where cheerleaders display banners with their own (not FHSAA's) messages, and where FHSAA-mandated press conferences feature speech of individual coaches; (2) on the scoreboards and ribbon boards, where FHSAA speech is intermixed with speech of its own sponsors and with entities that FHSAA has nothing (and wants nothing) to do with, such as alcohol companies; and (3) on the walls of the lower bowl, which feature intermixed FHSAA signage, sponsor banners, and homemade fan banners.

2.    Endorsement Evidence Shows the Loudspeaker Is Not Used Solely for Government Speech

In the first appeal of this case, this Court preliminarily concluded that the endorsement factor weighed in favor of government speech, but noted that CCS "is free to develop more facts as the litigation proceeds." *CCS*, 942 F.3d at 1234. CCS did so and that evidence now points decidedly toward a conclusion that not all speech over the loudspeaker is perceived as government speech.

First, FHSAA officials themselves distinguish between FHSAA speech and the speech of others on the PA system. They recognize sponsor ads as messages of the sponsor, not FHSAA. *Supra* pp.26-27; A-4247 (¶63) & A-13285 (errata). They recognize schools' halftime PA announcer and musical selections as speaking on

behalf of the school, not FHSAA.  A-4249-50 (¶¶70-75); A-13008.  FHSAA even recognizes the National Anthem performer as speaking on his or her own behalf.  A-4248 (¶65).[12]

Second, CCS's prayer would have been delivered by a school representative, not the PA announcer.  A-12601 (CCS head of school requesting that he be allowed to say the prayer).  Moreover, to provide further distance, the PA announcer, before relinquishing the microphone, could have expressly advised listeners that they were about to hear a message from the schools, not FHSAA.  Despite many loudspeaker prayers at SCS events, FHSAA has not identified any evidence of confusion or complaints relating to them—not at the 2012 final and not at the several playoff games in 2015 and 2020.  *See Kennedy*, 142 S.Ct. at 2426 (faulting government for not crediting that "no one complained" it had somehow endorsed religious speech).  And for good reason: high school students (and their parents, teachers, and friends) "are capable of distinguishing between State-initiated, school-sponsored, or teacher-led religious speech on the one hand, and student-initiated, student-led religious speech on the other."  *Board of Ed. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250-51 (1990).  *See also Chandler v. Siegelman*, 230 F.3d 1313, 1317 (11th Cir. 2000) ("a [school] policy which tolerates religion does not improperly endorse

---

[12] FHSAA's ability to distinguish among speakers at its events is not limited to the PA system; it does so for signage, too.  A-4252-53 (¶¶82-85).

it"); *Adler v. Duval Cnty. Sch. Bd.*, 250 F.3d 1330, 1333 (11th Cir. 2001) ("[S]chools do not endorse all speech that they do not censor."). Indeed, when citizens see a private speaker using government property, they "might simply … associate" the speech with the private speaker, not the government. *Shurtleff*, 142 S.Ct. at 1591. FHSAA well understands this because ***its own senior official*** recognized that the 2012 prayer was ***not*** FHSAA's speech. A-11580, A-11582 (Tr.81:8-11, 88:1-17).

Third, the district court largely relied on this Court's preliminary conclusions about the context of the speech—the proximity to the National Anthem, the name of the game as a "State" final, and the use of a government-owned stadium. A-13480-81 (citing *CCS*, 942 F.3d at 1233). A fully developed record undermines these suppositions.

The brief 2012 prayer occurred a full twelve minutes before the National Anthem, with the Junior Orange Bowl awards (a private party) and then an eight-minute break intervening. *Compare* A-4292*, with* A-4294.[13] Moreover, the host school—not FHSAA—arranged the National Anthem at the 2015 final game, A-12228 (§4.7.2.5.4), A-11655 (Tr.154:20-157:20), A-13011, and FHSAA testified it considered this to be the school's performance, not FHSAA's. A-11038 (Tr.190:5-9). The use of "State" in the name of the game—and the use of a publicly-owned

---

[13] In any event, if this timing matters so much, how could FHSAA deem UCS's "One God" banner to be the school's speech when it was displayed *right after* the performance of the National Anthem?

stadium—is not limited to the final game. The playoffs, often hosted at publicly-owned stadiums, are also part of the FHSAA "*State* Championship Series," and the penultimate game is the "*State* Semifinal." Yet FHSAA has had no problem, throughout this litigation, in saying that it is detached from playoff games in the same "State" series.[14]

<u>Fourth</u>, this Court previously noted that "[a]dvertisements over the public-address system might be relevant to any analysis of the endorsement factor" if, "for example, the ads were framed as 'thank yous' or were presented in more promotional terms." *CCS*, 942 F.3d at 1234. The hundreds of PA scripts produced by FHSAA in discovery revealed that sponsor announcements are lengthy promotional texts—copy prepared by the sponsors and inserted into the PA script without editing by FHSAA. For example, at the 2012 Class 2A championship game, twelve of the forty-four script prompts were promotional ads for sponsors, A-4292-4306, and had long messages like:

> For high-quality, high-performance sporting goods, you just can't beat the Spalding brand. Our dedication to excellence, quality and innovative ideas have kept us at the top of our game for more than 125 years. When you play with Spalding, like the teams in the 2012 F-H-

---

[14] This Court also "assume[d] that the organizers of a sporting event … generally would not allow a public-address system to be used to convey messages they didn't want to be associated with." *CCS*, 942 F.3d at 1233. As it turns out, FHSAA did just this for both the loudspeaker and scoreboards. *Supra* pp.30-31.

> S-A-A football finals, you can play with confidence, on the court or on
> the field. When you play with Spalding, you play the best!

A-4301. The references to "our" and "us" are not to FHSAA—they are to Spalding,

whose private, promotional speech was being read. A-10905 (Tr.62:21-63:6). The

district court discounted promotional ads on the theory that many of them occur

during the game and "[s]peech occurring at other points during the game is less

controlling," but it offered no reason for this conclusion. A-13482. The loudspeaker

is used throughout the event—pre-game, in-game, half-time, and post-game—and a

listener's perceptions will be formed based on its overall use. Indeed, if the

government could simply define a forum down to the precise second the government

is speaking, then no plaintiff would even prevail in the government-speech analysis.

> 3.    The Control Evidence Shows the Loudspeaker Is Not Used Solely for
>        Government Speech

The control factor examines whether government "'maintains direct control

over the messages conveyed' through the speech in question." *CCS*, 942 F.3d at

1234 (quoting *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S.

200, 213 (2015)). In its prior opinion, this Court explained that this factor might

turn on: (1) "whether anyone other than the FHSAA announcer spoke over the

loudspeaker"; (2) "whether the FHSAA reserved any right to reject a song or musical

choice [at halftime] or that the participating school could not play songs with, for

example, explicitly religious or political messages"; and (3) whether FHSAA

"reworded, censored, or sometimes rejected" announcements made pursuant to the Administrative Procedures. *Id.* at 1235. Discovery yielded detailed answers to these questions, and they all point against a finding of government speech.

First, as noted, FHSAA has a long history of allowing speakers other than the PA announcer to speak over the loudspeaker, including "periodically often" allowing unscripted welcoming remarks by schools. *Supra* pp.22-23. Accordingly, the district court was flat wrong in asserting that "only the PA announcer had access to the loudspeaker." A-13484.

Moreover, just as the PA announcer did not always control the microphone, neither did FHSAA's script always "control" the PA announcer, who was not an FHSAA employee or contractor. A-4235-36 (¶¶12, 19); A-11034 (Tr. 175:13-18). For example, scripts often directed the PA announcer to "improvise" during half-time or to "play music," with no apparent review of the content of that music. A-4236 (¶19); A-11034 (Tr. 175:13-18); A-4245 (¶55 & n.14).

Second, the evidence is undisputed that FHSAA exercises no editorial control over halftime music and announcements, and that music with an explicit religious message is permissible. *Supra* pp.23-24.

Third, the record shows that FHSAA rarely, if ever, reworded, censored, or rejected PA script that came from third parties. A-4248-49 (¶¶66, 68); A-12731 (§14.b.(2)); A-2621 (conceding that FHSAA "rarely" modified content provided by

sponsors), A-2703 (¶12) (conceding that sponsor copy is "usually … cut-and-pasted into PA scripts without revision"). Indeed, FHSAA even included speech with which it affirmatively disagreed. *Supra* pp.30-31.

The district court relied on FHSAA's "ultimate authority" to reject sponsor text, A-13483, but it is true in *every* case that the government *could* have exercised control. The question is whether it *did* exercise control. *See Shurtleff*, 142 S.Ct. at 1592 ("[W]e look at the extent to which Boston **actively controlled** these flag raisings and shaped the messages the flags sent.") (emphasis added). FHSAA did not.[15]

## B.    The Prayer Ban Constitutes Illegal Viewpoint Discrimination

"The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). This prohibition applies regardless of forum. *See id.*; *CCS*, 942 F.3d at 1240. This Court previously noted that "discovery might reveal that the FHSAA barred the schools from speaking because the prayer would have expressed an impermissibly religious *viewpoint* on a topic that was included in the ambit of the

---

[15] The district court wrongly stated "every word that goes into the PA scripts … is put there by an FHSAA employee." A-13483. FHSAA testified that some scripts are created by other entities. A-11182 (Tr.120.23-121:2, 123:16-20); A-11246 (Tr.65:2-10).

forum and could otherwise have been discussed in a nonreligious way." *CCS*, 942 F.3d at 1242 n.8. This is precisely what the undisputed evidence has now revealed.

First, in denying CCS's request, FHSAA offered no reason other than the speech's religious viewpoint. A-12606, A-12611. These candid statements alone suffice to show unconstitutional discrimination. *See Shurtleff*, 142 S.Ct. at 1593 (where government denies request based on mistaken belief that requested conduct "could violate the Establishment Clause," it constitutes impermissible viewpoint discrimination); *Rosenberger*, 515 U.S. at 832.

Second, FHSAA routinely permitted other messages about the same topics addressed in CCS's pre-game prayers. CCS's pre-game prayers are meant to solemnize and commemorate the occasion; recognize and thank God for the opportunity to participate; request God's protection for the players; and request that God help all participants and fans display good sportsmanship and attitudes towards each other and game officials. *Supra* p.5. FHSAA has routinely permitted similar messages, from a secular viewpoint, to be conveyed over the PA system and similar channels.

FHSAA routinely permitted solemnizing and memorializing messages over the PA system, such as long moments of "silent reflection." A-4254-55 (¶¶89-90). This is precisely the type of evidence this Court held would establish impermissible viewpoint discrimination. *See CCS*, 942 F.3d at 1242 n.8 ("If a secular act of

solemnization or invocation of some sort would have been permitted by the state at the outset of the game, [CCS's] case for discrimination against a religious viewpoint would be stronger."); *see also Rosenberger*, 515 U.S. at 831.

FHSAA also routinely transmitted over the loudspeaker messages concerning many of the other topics covered in CCS's prayers.  It conveyed messages on ethics and morality ("be kind to each other and treat one another with respect" because "we are all human!").  *Supra* p.21.  It conveyed messages on sportsmanship, such as the one in the 2015 Class 2A final script, which stated "sportsmanship is the most important lesson taught through participation in high school athletics" and urged the crowd to act in a "positive manner," show respect, and display "pride in your school, your team and yourself."  A-4309; A-4311; A-4321.  It permitted "periodically often" schools to provide unscripted welcoming remarks.  It routinely encouraged athletes to "excel in competition the old-fashioned way—through hard work, perseverance and dedication" and to avoid the "tempting" use of steroids.  A-5145; A-4602.  It frequently expressed gratitude to and recognition for corporations and persons.  A-4256 (¶¶95-96).

In short, CCS's speech is barred because it is a religious prayer and for no other reason.  That is unlawful discrimination.

**C.    The Prayer Ban Constitutes an Arbitrary and Unreasonable Regulation of Speech.**

The sheer volume of unscripted, private speech permitted on the PA system at FHSAA events shows it was a limited public forum.  *See CCS*, 942 F.3d at 1237 ("A limited public forum … exists where a government has reserve[ed a forum] for certain groups or for the discussion of certain topics").  But, regardless of forum, the state may not engage in unreasonable, haphazard, or arbitrary restrictions on speech. *See Rosenberger*, 515 U.S. at 829 (in "limited forum" exclusion must be "reasonable"); *Minnesota Voters All. v. Mansky*, 138 S.Ct. 1876, 1888 (2018) (in nonpublic forum, "State must draw a reasonable line" and "be able to articulate some sensible basis for distinguishing what may come in from what must stay out").  This Court previously held that the Prayer Ban would be impermissible if it was "exercised in an arbitrary or haphazard manner" or was "too indeterminate and haphazardly applied," and noted that CCS's allegations about inconsistent application were "troubling."  *CCS*, 942 F.3d at 1240, 1243, 1246.

The troubling allegations have become damning proof.  FHSAA expressly permitted pre-game prayer over the loudspeaker at the 2012 game.  It permitted CCS's pre-game prayers over the loudspeaker at the 2015 and 2020 playoff, as well as at every CCS home game and many away games for as long as CCS has been an FHSAA member school.  It would permit schools to play religious songs over the PA system at halftime.  It uses the PA system to direct the audience to its social-

media accounts, which feature many posts with prayers and religious messages. It permits religious messages on the field and in the stands. And, despite all these inconsistencies, FHSSA *still* "hasn't told us why" the Establishment Clause—FHSAA's *only* explanation for the Prayer Ban—"barred speech at the 2015 championship game when it didn't bar" this other religious speech. *CCS*, 942 F.3d at 1244.

Nor can FHSAA claim that the Prayer Ban was "wholly consistent" with the forum's purpose. Discovery confirmed what this Court suspected: "some pregame solemnizing messages of a different sort … were considered appropriate for the forum," including welcoming remarks, moments of silence, oaths, and "ethical" messages; "FHSAA saw [and sees] no problem with … teams praying together at the 50-yardline" (A-4244-45 (¶¶49, 52, 53)) or making other religious displays visible to the crowd (A-4239-40, A-4253 (¶¶ 34-36, 85)); and, "most significantly," FHSAA permitted pre-game prayer over the PA system on many occasions (A-4234, A-4238-39 (¶¶ 5, 29, 32); A-13006). *CCS*, 942 F.3d at 1244, 1246.

In sum, the Prayer Ban is arbitrary and unreasonable—and unconstitutional.

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment below should be reversed, and summary judgment should be entered in CCS's favor.

Respectfully submitted,

 */s/ Jesse Panuccio*

Kelly J. Shackelford

Jesse Panuccio

Jeffrey C. Mateer

BOIES SCHILLER FLEXNER LLP

Hiram S. Sasser, III

401 E. Las Olas Blvd., Ste. 1200

David J. Hacker

Fort Lauderdale, FL  33301

Jeremiah G. Dys

(954) 356-0011

FIRST LIBERTY INSTITUTE

jpanuccio@bsfllp.com

2001 W. Plano Pkwy., Ste. 1600

Plano, TX  75075

(972) 941-4444

Blake Atherton

jdys@firstliberty.org

BOIES SCHILLER FLEXNER LLP

1401 New York Ave., NW

Rebecca R. Dummermuth

Washington, DC  20005

FIRST LIBERTY INSTITUTE

batherton@bsfllp.com

227 Pennsylvania Ave., S.E.

Washington, DC  20003

bdummermuth@firstliberty.org

Adam M. Foslid

WINSTON & STRAWN LLP

200 S. Biscayne Boulevard, Ste. 2400

Eliot Pedrosa

JONES DAY

Miami, FL  33131

600 Brickell Ave., Ste. 3300

(305) 910-0646

Miami, FL  33131

afoslid@winston.com

(305) 714-9717

epedrosa@jonesday.com

Jorge Perez Santiago

STUMPHAUZER FOSLID SLOMAN ROSS & KOLAYA, PLLC

Two S. Biscayne Blvd., Ste. 1600

Miami, FL  33131

jperezsantiago@sfslaw.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS</u>

**Type-Volume**: This brief complies with the type-volume limits of FRAP 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by FRAP 32(f) and 11th Cir. Rule 32-4, this document contains 12,981 words.

**Typeface and Type-Style**: This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

*/s/ Jesse Panuccio*
Jesse Panuccio

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on August 8, 2022, a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Jesse Panuccio*
Jesse Panuccio