No. 22-11222

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

CAMBRIDGE CHRISTIAN SCHOOL, INC.,
*Plaintiff-Appellant,*

v.

FLORIDA HIGH SCHOOL ATHLETIC ASSOCIATION, INC.,
*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Middle District of Florida
No. 8:16-cv-02753-CEH-AAS

_____

## BRIEF OF *AMICUS CURIAE* FLORIDA DEPARTMENT OF EDUCATION
## IN SUPPORT OF APPELLANT

_____

Jeffrey M. Harris
  *Counsel of Record*
Tiffany H. Bates
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

Dated: August 15, 2022            *Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

Per Rule 26.1 and 11th Cir. R. 26-1.1, *amicus curiae* certifies that in addition

to the persons and entities named in the parties' certificates of interested persons, the

following individuals or entities may have an interest in the outcome of this appeal:

1. Bates, Tiffany

2. Consovoy McCarthy PLLC

3. Florida Department of Education

4. Harris, Jeffrey


Dated: August 15, 2022                    Respectfully submitted,

                                          */s/ Jeffrey M. Harris*

i

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ........................... 1

STATEMENT OF THE ISSUE ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................... 2

   I.   CCS's belief in communal prayer is clearly sincere and FHSAA should not have questioned its sincerity. .................................................... 4

  II.  FHSAA's post hoc rationales are improper gamesmanship and should be disregarded. ................................................................................. 10

 III.  FHSAA failed to take seriously the strict scrutiny analysis that requires close analysis of less restrictive alternatives. ................................ 16

CONCLUSION ..................................................................................... 21

CERTIFICATE OF COMPLIANCE...................................................... 22

CERTIFICATE OF SERVICE ............................................................... 22

# TABLE OF AUTHORITIES

**CASES**

*Am. Legion v. Am. Humanist Ass'n,*
  139 S. Ct. 2067 (2019) ................................................................ 12

*Attwood v. Clemons,*
  526 F. Supp. 3d 1152 (N.D. Fla. 2021) ........................................ 14

*Bourgeois v. Peters,*
  387 F.3d 1303 (11th Cir. 2004) ........................................ 13, 14, 16

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) ..................................................................... 8, 9

*Cambridge Christian Sch., Inc. v. Florida High School Athletics Ass'n, Inc.,*
  942 F.3d 1215 (11th Cir. 2019) ................................................ 5, 11

*Capitol Square Rev. & Advisory Bd. v. Pinette,*
  515 U.S. 753 (1995) ...................................................................... 12

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ...................................................................... 16

*Corp. of Presiding Bishop of Church of Jesus Christ of Latterday Saints*
  *v. Amos,* 483 U.S. 327 (1987) ................................................... 5, 12

*Davila v. Gladden,*
  777 F.3d 1198 (11th Cir. 2015) .................................................. 4, 7

*Everson v. Board of Education of Ewing,*
  330 U.S. 1 (1947) ............................................................................ 4

*Frazee v. Illinois Dep't of Employment Sec.,*
  489 U.S. 829 (1989) ................................................................... 9, 10

*Glenn v. Brumby,*
  663 F.3d 1312 (11th Cir. 2011) .................................................... 15

*Good News Club v. Milford Cent. Sch.,*
  533 U.S. 98 (2001) ........................................................................ 17

*Haight v. Thompson,*
  763 F.3d 554 (6th Cir. 2014) ........................................................ 14

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
  480 U.S. 136 (1987)............................................................................ 5

*Kennedy v. Bremerton Sch. Dist.*,
  142 S. Ct. 2407 (2022)............................................... 2, 4, 5, 12, 13

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*,
  508 U.S. 384 (1993)........................................................................ 12

*Locke v. Davey*,
  540 U.S. 712 (2004)........................................................................ 17

*McCullen v. Coakley*,
  573 U.S. 464 (2014)........................................................................ 18

*McDaniel v. Paty*,
  435 U.S. 618 (1978)........................................................................ 16

*McLaughlin v. City of Lowell*,
  140 F. Supp. 3d 177 (D. Mass. 2015)............................................ 15

*Multimedia Pub. Co. of S.C. v. Greenville-Spartanburg Airport Dist.*,
  991 F.2d 154 (4th Cir. 1993) ......................................................... 14

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)........................................................................ 16

*Searcey v. Harris*,
  888 F.2d 1134 (11th Cir. 1989) ..................................................... 14

*Shaw v. Hunt*,
  517 U.S. 899 (1996)........................................................................ 15

*Thomas v. Review Bd. of the Ind. Employment Sec. Div.*,
  450 U.S. 707 (1981).......................................................... 8, 9, 10, 18

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969)........................................................................... 5

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  137 S. Ct. 2012 (2017)......................................................... 4, 12, 16

*United States v. Seeger*,
  380 U.S. 163 (1965)........................................................................... 9

*United States v. Virginia*,
  518 U.S. 515 (1996).................................................................. 13, 15

iv

*Warnock v. Archer*,
  380 F.3d 1076 (8th Cir. 2004) ......................................................... 12

*Watts v. Fla. Int'l Univ.*,
  495 F.3d 1289 (11th Cir. 2007) ........................................... 8, 9, 10

*Widmar v. Vincent*,
  454 U.S. 263 (1981)......................................................................... 17

*Yellowbear v. Lampert*,
  741 F.3d 48 (10th Cir. 2014) ......................................................... 14

## OTHER AUTHORITIES

Carl H. Esbeck, *After* Espinoza, *What's Left of the Establishment Clause?*,
  21 Federalist Soc'y Rev. 186 (2020). ........................................... 12

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

*Amicus curiae* is the Florida Department of Education, the state education agency of Florida.[1] The Department works hand in hand with parents, teachers, educators, and community members to improve Florida's education system for students of all backgrounds and abilities. Serving approximately 2.8 million students, 4,400 public schools, 28 colleges, 202,500 instructional staff, 46,000 college professors and administrators, and 340,000 full-time staff throughout the state, the Department enhances the economic self-sufficiency of Floridians through programs and services geared toward college, workforce education, apprenticeships, job-specific skills, and career development. The Department also has an interest in supporting the First Amendment rights of Florida students. It thus has a significant interest in this case.

## STATEMENT OF THE ISSUE

Whether a state actor violated free-exercise and free-speech rights by denying a religious school access to a stadium loudspeaker to engage in a communal pregame prayer at a championship football game between two Christian schools.

---

[1] No party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than *amicus*, its members, or its counsel contributed money that was intended to fund the preparation or submission of this brief. Pursuant to FRAP 29, "a state may file an amicus brief without the consent of the parties or leave of court."

## INTRODUCTION AND SUMMARY OF ARGUMENT

The First Amendment provides two overlapping protections for religious speech, and that "is no accident." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022). "It is a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent." *Id*. Yet the Florida High School Athletic Association (FHSAA) completely disregarded core First Amendment principles when it refused to allow Cambridge Christian School (CCS) to pray over the loudspeaker at its 2015 championship game solely because of the religious message of the prayer, even though secular, non-governmental messages were allowed. Instead of working with the school to come up with a solution, FHSAA challenged the sincerity of their religious beliefs, invented ex post rationales for the denial, and refused to consider any alternatives, which it was required to do under bedrock principles of constitutional law.

Throughout this litigation, FHSAA has improperly questioned the sincerity of CCS's belief in pregame communal prayer over the loudspeaker. FHSAA insists that CCS' beliefs about communal prayer—beliefs about *where and how to pray*—are mere preference, not protected religious beliefs. That astonishing view both diminishes the abundant record evidence that CCS's belief is sincere and warps the limited sincerity analysis that courts may undertake. No responsible state actor that

2

respected religious liberty would have handled this highly sensitive matter in this way.

Nor would a responsible state actor engage in improper gamesmanship by inventing new, ex post rationales for its decision. At first, FHSAA claimed that the Establishment Clause prevented it from allowing CCS to use the loudspeaker to pray. But it has now abandoned that rationale, offering a list of after-the-fact justifications for its denial. Such post hoc rationalizations cannot save a policy that impinges First Amendment rights.

Finally, non-neutral state actions that burden religious speech are subject to strict scrutiny. Such actions may thus be justified only if the government proves that they are narrowly tailored to serve compelling state interests. But FHSAA failed to take this analysis seriously. It failed to offer a genuine compelling state interest in restricting the speech at issue and refused to consider any of the numerous, reasonable alternatives that it was required to consider under strict scrutiny. A responsible government entity would have handled this matter with due regard to the weighty interests at stake by seeking at the outset to achieve a resolution that took all feasible steps to accommodate the religious liberty interests at stake. FHSAA entirely failed at that constitutionally mandated task. This Court should reverse the decision below and enter judgment for CCS.

## ARGUMENT

**I.    CCS's belief in communal prayer is clearly sincere and FHSAA should not have questioned its sincerity.**

CCS's belief in communal prayer is clearly sincere. Yet throughout this litigation, FHSAA has improperly questioned that sincerity. FHSAA insists that CCS's beliefs are insincere because it "lack[s] any written statement about [its] belief" in communal prayer and claims that CCS "never made any effort to live by" this belief. Def.'s Mot. Summ. J., A-2601. Instead, FHSSA argues, CCS's beliefs about communal prayer—beliefs about *where and how to pray*—are "mere preference[s]," not protected religious beliefs. *Id.* That astonishing view both diminishes the abundant record evidence that CCS's belief is sincere and warps the sincerity analysis. "A secular, civil court is a poor forum to litigate the sincerity of a person's religious beliefs." *Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015).

The Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly." *Kennedy*, 142 S. Ct. at 2421. Indeed, the Clause does "its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Id.* A state "cannot hamper its citizens in the free exercise of their own religion." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2020 (2017) (quoting *Everson v. Board of Education of Ewing*, 330

4

U.S. 1, 16 (1947)). Students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

The Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices." *Corp. of Presiding Bishop of Church of Jesus Christ of Latterday Saints v. Amos*, 483 U.S. 327, 334 (1987) (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987)). At the very least, a "government entity" may not—as FHSAA did here— "burden[] [a] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 142 S. Ct. at 2422.

Communal prayer is a "fundamental belief and practice of the CCS community." Pl.'s Mot. Summ. J., A-4268. As this Court has recognized, "communal prayer is deeply rooted in religious traditions the world over. Christians in particular have been engaging in communal prayer and ritual since the first century." *Cambridge Christian Sch., Inc. v. Florida High School Athletics Ass'n, Inc.*, 942 F.3d 1215, 1248 (11th Cir. 2019). This kind of prayer allows CCS to carry out its mission "[t]o glorify God in all that [they] do" and "to serve the local and global community." Pl.'s Mot. Summ. J., A-4268. As one CCS parent and volunteer PA announcer explained, "Our sacred text, the Holy Bible, teaches that God listens

5

to our communal prayers. For example, Matthew 18:20 states: 'For where two or three are gathered in my name, there am I among them.'" A-11953 (¶31). *See also* Pl.'s Br. in Opp., A-13411 at n. 23 (collecting scripture on the importance of vocal, communal prayer). And in large venues, like stadiums, praying over the loudspeaker allows everyone in the CCS community in attendance to hear and participate in the prayer.

From announcements over the PA system each morning to the graduation ceremony at the end of the year, CCS conducts communal prayer in nearly every group activity. Pl.'s Mot. Summ. J., A-4268. The athletic field is no exception. Indeed, CCS has led public prayer over a loudspeaker at nearly every football game it has played. *Id.* Specifically, CCS "has engaged in communal prayer over the loudspeaker *every time* it has played another Christian school (other than the 2015 final) and *every time* it has been in [a State Champion Series] game (other than the 2015 final)." CCS Opening Br. 37.

But all of this was not enough to convince FHSAA that CCS's belief is sincere. Instead, FHSAA *challenged* the school's sincerity, arguing that pregame communal prayer over a loudspeaker was not a "long-standing practice and tradition for CCS" and thus not a "protected belief" because CCS did not request to pray over the loudspeaker at *two* regular-season away games "in deference to a non-religious

school's tradition on its own field." D.Ct. Order, A-13494; CCS Opening Br. 37. According to FHSAA, those two instances alone meant that CCS's deeply held beliefs about where, when, and how to pray were simply preferences that FHSAA could override at its discretion.

Remarkably, the district court agreed. Although the court acknowledged that its "role is not to drill too far down into belief and sincerity to determine whether communal pregame prayer is a sincerely-held belief of CCS," the court did just that. D.Ct. Order, A-13494 (internal marks omitted). It concluded that CCS's practice of "engaging in communal pre-game prayer using the PA system at football games" was not a "deeply rooted tradition that rises to the level of a sincerely held belief" because CCS didn't *always* use a loudspeaker *every time* it engaged in communal prayer. *Id.* at A-13496. In the court's view, that alleged inconsistency transformed CCS's view from a protected "belief" into an unprotected "preference." *Id.*

That framing flips the sincerity analysis on its head. Courts may make surface level determinations about whether a party is sincere in its religious beliefs, but that inquiry is carefully limited. A court may look only to whether the litigant "is (in essence) seeking to perpetrate a fraud on the court—whether he actually holds the beliefs he claims to hold." *Davila,* 777 F.3d at 1204. But a court "lack[s] any license to decide the relative value of a particular exercise to a religion." *Id.* at 1204. And

7

any alleged inconsistency in the practice of that belief cannot undermine the sincerity of the belief. "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'" *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1297 (11th Cir. 2007) (quoting *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 714 (1981)).

*Thomas v. Review Board* is instructive. There, the Supreme Court "considered and rejected" a state court's conclusion that a perceived inconsistency in a religious belief stripped that belief of First Amendment protection. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014). Thomas (a Jehovah's Witness) challenged Indiana's denial of unemployment compensation after he was fired for refusing to directly manufacture war materials after a transfer at his job. Thomas believed that his faith permitted him to help manufacture steel that was used in making weapons but forbade him from helping to make the weapons themselves. Although "the state court had difficulty with the line that the employee drew between work that he found to be consistent with his religious beliefs," the Court held that "it is not for us to say that the line he drew was an unreasonable one." *Id.* at 725. So too here. FHSAA argued, and the district court concluded, that CCS's practice of communal prayer over a loudspeaker was not a "protected belief" because the school didn't use a loudspeaker *every time* it prayed. Instead, CCS twice deferred to a non-religious

8

school's tradition on its own field and did not (as the visiting team being respectful to its hosts) ask to pray on the loudspeaker. But whether that decision was correct, reasonable, or consistent was not FHSAA's or district court's call.

Moreover, the district court ultimately concluded that CCS's desire to engage in pregame communal prayer was not a religious belief at all. It is true that "[o]nly beliefs rooted in religion are protected by the Free Exercise Clause," and that "[p]urely secular views do not suffice." *Frazee v. Illinois Dep't of Employment Sec.*, 489 U.S. 829, 833 (1989) (quoting *Thomas*, 450 U.S. at 713). But the Supreme Court has "explain[ed] how to go about determin[ing] … what is a religious belief or practice." *Watts*, 495 F.3d at 1297 (cleaned up). A religious belief, the Court explained, does not "turn upon a judicial perception of the particular belief or practice in question." *Id.* Instead, a court's "'narrow function … is to determine' whether the line drawn reflects 'an honest conviction.'" *Hobby Lobby*, 573 U.S. at 725. "The honest (sincere) conviction that counts is that of the plaintiff, not that of the court." *Watts*, 495 F.3d at 1297. After all, "the First Amendment protects beliefs that are, in the claimant's 'own scheme of things,' religious." *Id.* at 1297 (quoting *United States v. Seeger*, 380 U.S. 163, 185 (1965)).

CCS's belief in and practice of pregame communal prayer is obviously "religious" in its view. Yet the district court concluded that it was merely a

9

"preference" since it wasn't—in *the court's* view—practiced with flawless consistency. D.Ct. Order, A-13496. The Supreme Court "t[ook] to task the lower court" for similar reasoning in *Thomas*. *Watts*, 495 F.3d at 1297. There, the Court rebuked the state court "for concluding that the man's refusal to [directly] participate in the production of war materials was a 'personal philosophical choice rather than a religious choice'" because he did not object to manufacturing steel that would later be used in the production of war materials. *Watts*, 495 F.3d at 1297. Indeed, the Court has "[n]ever … suggest[ed]" that unless a claimant's practices are perfectly consistent, "his belief, however sincere, must be deemed a purely personal preference rather than a religious belief*." Frazee*, 489 U.S. at 833.

At bottom, decisions about where, when, and how to pray are clearly "rooted in religion." *Thomas*, 450 U.S. at 713. And the record unquestionably reflects CCS's sincere belief in conducting pregame communal prayer over a loudspeaker. By questing CCS's sincerity on that record, FHSSA disrespected CCS's deeply held beliefs and unduly complicated and prolonged this litigation.

## II.    FHSAA's post hoc rationales are improper gamesmanship and should be disregarded.

While FHSAA initially justified its denial of CCS's prayer request on Establishment Clause grounds, it subsequently abandoned that rationale. Instead, it offered a list of ex post justifications. Yet again, CCS deserved better. Once

10

FHSAA's initial rationale for its denial became untenable, it was deeply irresponsible for the agency to double down and seek to defend its actions on grounds that indisputably did not underlie its contemporaneous decision.

On December 2, 2015, FHSAA denied CCS permission to pray over the loudspeaker before the championship game, claiming that the Establishment Clause made praying at a public facility "off limits." Pl.'s Mot. Summ. J., A-4243-44 (¶47), citing Ex. 20. Prayer over the loudspeaker, the association concluded, could be "viewed as [FHSAA] endorsing or sponsoring religion." A-12611. Indeed, the Establishment Clause was FSHAA's *sole* justification for denying the request. A-4262. *Accord Cambridge*, 942 F.3d at 1244 (reporting that the "only explanation for the new restriction offered by the FHSAA was that prayer was not permitted by the Establishment Clause").

At first, FHSAA maintained this Establishment Clause rationale in the district court. It argued that CCS's desire for prayer "would violate the Establishment Clause," and FHSAA's current protocol "embodies the neutrality mandated by the Establishment Clause." Def's Mot. to Dismiss, A-674-675. But on appeal to this Court the first time, FHSAA downplayed that rationale. Instead, FHSAA maintained that "Cambridge Christian failed to state a claim under the Free Speech Clause" because "[a]nnouncements over the Stadium's public-address system are

11

government speech and are therefore not subject to First Amendment scrutiny." Answer Br. of Appellee FHSAA, No. 17-12802, 12-13. In the alternative, FHSAA argued that "[e]ven if the announcements over the Stadium's public-address system were private speech, the Stadium's public-address system is a non-public forum." *Id.* at 20.

On remand to the district court, FHSAA did not raise the Establishment Clause as an affirmative defense. Def.'s Answer and Affirmative Defenses, A-959-60.[2] Nor did its motion for summary judgment even contain a single sentence of

---

[2] Ultimately, it was wise for FHSAA to abandon the Establishment Clause rationale because the Establishment Clause is not violated by government toleration of private religious speech. An Establishment Clause violation "must be moored in government action." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 779 (1995) (O'Connor, J., concurring). And absent any promotion or favoritism of a certain religion, "the mere fact" that religious expression "occurs in a government setting does not render it unconstitutional." *Warnock v. Archer*, 380 F.3d 1076, 1082 (8th Cir. 2004) (citing *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394-95 (1993)).

Indeed, the Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Corp. of Presiding Bishop of Church of Jesus Christ of Latterday Saints*, 483 U.S. at 334; *see also Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2093 (2019) (Kavanaugh, J., concurring) ("allow[ing] private religious speech in public forums … does not violate the Establishment Clause") (collecting cases). That makes sense, because the key principle behind the Establishment Clause is "to keep government from interfering with the private religious choices made by citizens." Carl H. Esbeck, *After* Espinoza, *What's Left of the Establishment Clause?*, 21 Federalist Soc'y Rev. 186 (2020). Simply put, a state "cannot hamper its citizens in the free exercise of their own religion." *Trinity Lutheran*, 137 S. Ct. at 2020. And it cannot use the Establishment Clause to do so. The Constitution's free exercise protections would be greatly diminished if the government could not tolerate private religious expression. The government simply does not "establish" a religion by allowing private religious speech. *See also Kennedy*, 142 S. Ct. at 2427 ("An Establishment Clause violation does not automatically follow whenever a public school or other government entity 'fail[s] to censor' private religious speech. Nor does the

Establishment Clause analysis. Instead, FHSAA again invoked the government speech and nonpublic forum arguments. Def's Mot. Summ. J., A-2614-27. Nowhere did FHSAA contend that it could not permit prayer on Establishment Clause grounds.

FHSAA's attempt to defend its actions based on ex post rationales is not only foreclosed by precedent but—once again—merely serves to prolong this litigation and disrespect CCS's religious beliefs. It is telling that FHSAA "cannot even decide from one stage of litigation to the next what precisely was the basis for its decision" to deny CCS the ability to pray over the loudspeaker. *Bourgeois v. Peters*, 387 F.3d 1303, 1323 (11th Cir. 2004). But its "post hoc rationalizations" about government speech and nonpublic forums cannot save a policy that impinges First Amendment rights. *Id.* State actors should not and cannot engage in such about-faces to justify restrictions on First Amendment rights. Indeed, the Supreme Court has recently emphasized that "[g]overnment justification[s] for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" *Kennedy*, 142 S. Ct. at 2407 (quoting *United States v. Virginia*, 518 U.S. at 533).

---

Clause 'compel the government to purge from the public sphere' anything an objective observer could reasonably infer endorses or 'partakes of the religious.'") (citations omitted).

13

Courts have repeatedly invalidated ex post rationales for infringing on First Amendment rights. In *Bourgeois v. Peters*, for example, this court explained that "[t]he First Amendment does not permit the government to place burdens on speech and assembly in [] an unprincipled, *ad hoc* manner." 387 F.3d at 1318. In that case, "the fact that" a city could not "decide from one stage of litigation to the next what precisely was the basis for its decision to search protestors" precluded the city's action from surviving strict scrutiny. *Id.* at 1323. *See also Searcey v. Harris*, 888 F.2d 1134, 1322 (11th Cir. 1989) (finding that speech restrictions violated the First Amendment because, among other reasons, "[t]here is no evidence which even arguably explains the [school] Board's change in position"); *Attwood v. Clemons*, 526 F. Supp. 3d 1152, 1173 (N.D. Fla. 2021) (observing that a "reasonable factfinder could find that Defendant's explanation that he blocked Plaintiff because of Plaintiff's propensity for profanity is a pretextual, post-hoc justification"); *Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014) (reiterating that "[o]nly the true explanations for" denying a religious accommodation "count"); *Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014) (describing that in the RLUIPA context, "post-hoc rationalizations" cannot constitute a compelling interest); *Multimedia Pub. Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 162 (4th Cir. 1993) (holding that the "district court did not err in determining that the

14

governmental interests asserted as justification for the ban were *post hoc,* pretextual creations").

Courts likewise discount ex post rationales with respect to violations of other rights. In *United States v. Virginia*, 518 U.S. 515, 533 (1996), for example, the Supreme Court held that any justification for different classifications based on gender "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Accord Glenn v. Brumby*, 663 F.3d 1312, 1321 (11th Cir. 2011) (reiterating the principle from *Virginia*); *cf. Shaw v. Hunt*, 517 U.S. 899, 908 n. 4 (1996) (finding that to "be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification"); *McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 190 (D. Mass. 2015) (reporting that the "principle [in *Shaw*] has also been extended to the First Amendment context").

By abandoning its Establishment Clause argument, FHSSA completely reinvented its rationale for restricting CCS's First Amendment rights mid-litigation. The Court should give no weight to FHSSA's ex post rationales here and should reaffirm that agency actions may be defended against constitutional challenge only based on the contemporaneous reasons supporting the challenged action.

15

### III.    FHSAA failed to take seriously the strict scrutiny analysis that requires close analysis of less restrictive alternatives.

State-sponsored religious discrimination is inherently suspect and "odious to our Constitution." *Trinity Lutheran*, 137 S. Ct. at 2025. Non-neutral state actions that burden religious speech are thus subject to the highest level of scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Indeed, such actions may be justified "only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). But FHSAA failed to take this analysis seriously by failing to offer a genuine compelling state interest and by refusing to consider any alternatives to an outright prohibition on CCS's speech. That alone "precludes a determination that the policy was in any way 'narrowly tailored.'" *Bourgeois*, 387 F.3d at 1323.

First, before restricting religious speech, a responsible government entity should have considered whether its interest was sufficiently compelling to satisfy strict scrutiny. But FHSAA failed to do so. "[O]nly a state interest 'of the highest order' can justify" a discriminatory government action. *Trinity Lutheran*, 137 S. Ct. at 2024 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)). Here, FHSAA cited only the Establishment Clause to justify its decision at the time. A-4262 (¶¶ 47, 51, 53. Although "a State has a compelling interest in not committing *actual* Establishment Clause violations," it has no such interest in not committing

16

*imaginary* ones. *Locke v. Davey*, 540 U.S. 712, 730 n.2, (2004) (Scalia, J., dissenting) (citing *Widmar v. Vincent*, 454 U.S. 263, 271 (1981)). Indeed, the Supreme Court "ha[s] never inferred from this principle that a State has a constitutionally sufficient interest in discriminating against religion in whatever other context it pleases, so long as it claims some connection, however attenuated, to establishment concerns." *Id.*

To the contrary, the Court has held that where there is "no valid Establishment Clause interest," the Establishment Clause cannot justify content- and viewpoint-based discrimination. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 113-14 (2001). At bottom, avoiding a purported Establishment Clause violation—especially where FHSAA apparently took few steps to confirm whether allowing the prayer would *actually* violate the Establishment Clause—does not provide FHSAA free rein to discriminate against religious speech. *See Widmar,* 454 U.S. at 276 ("the state interest asserted here—in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution—is limited by the Free Exercise Clause."). And nothing suggests that FHSAA considered CCS's own *free exercise* rights before prohibiting the pregame prayer over the loudspeaker. *See* Ex. 20 at A-12606.

17

But even if FHSAA had offered a genuine compelling government interest, it made no effort to explore readily available alternatives to outright denial of CCS's request. Narrow tailoring requires the state to demonstrate that a policy is the "least restrictive means" of achieving its objective. *Thomas,* 450 U.S. at 718. Specifically, the government must show that it "seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen v. Coakley,* 573 U.S. 464, 494 (2014). Moreover, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures" which imposed lesser burdens on religious liberty "would fail to achieve the government's interests, not simply that the chosen route was easier." *Id.* at 495. But no evidence suggests that FHSAA "consider[ed] any alternatives." A-1540-44 (Tr. 83:18-87:17). When asked by CCS's principal to recite a short prayer before the game's commencement, FHSAA simply refused. Ex. 20 at A-12606.

FHSAA could have considered several reasonable alternatives to clarify its neutrality to patrons. FHSAA might have instructed the PA speaker to announce on its behalf that the forthcoming prayer was the speech of a private individual and not FHSAA. Announcements of this sort are not uncommon, and previous FHSAA playoff scripts contained similar messages from sponsors. In fact, FHSAA script texts often stated that announcements were on behalf of an entity other than FHSAA.

18

*See* Pl.'s Mot. Summ. J., A-4246.

Indeed, FHSAA could have gone further and instructed the PA announcer to explicitly state that FHSAA does not endorse religion or the prayer. It might have announced the PA was being transferred to a person who is not an employee or contractor paid by FHSAA. *See* Ex. 63 at GOSC 000001 (allowing the principal of Dade Christian School to say a prayer over the PA system before the 2012 FHSAA 2A State Championship game).

Finally, FHSAA could have afforded CCS accommodations similar to those it has provided to other private speech that it does not necessarily endorse. For example, FHSAA previously turned a blind eye when signs were displayed at championship games that violated its alcohol policy. FHSAA "strictly prohibited" alcoholic beverages at the football championship games in 2012 and 2015, prohibited schools from engaging "alcoholic beverage companies" as local sponsors, and would not itself promote alcohol or have an alcohol company as a sponsor because it "had a responsibility [for] no alcohol, drugs, tobacco products, so on, so forth." Ex. 13 § I.7.C at A-12295; Ex. 17 § I.7.C at A-12569; Ex. 30 at A-12706; Dearing Tr. 98:18-21 at A-1540-44; FHSAA II (Rohrer) Tr. 38:7-9, 39:3-6, 39:14-17, 39:22-25 at A-11240. Yet at both the 2012 and 2015 State championship games, alcohol advertisements were prominently displayed inside the stadium, both as

19

permanent and electronic signs, and adjacent to FHSAA signs. Ex. 38 at A-12854 (Bud); Ex. 91 at 13138 (2012 Bud); Ex. 92 at A-13140 (2015 Coors); Ex. 93 at A-13204 (2015 Bud); Ex. 94 at A-13208 (2015 Bud); Ex. 95 at A-13214; Ex. 96 at A-13216 (Bud and Coors). FHSAA could have taken the same approach here—simply *do nothing* because (like the alcohol advertisements) no reasonable observer would have viewed a prayer delivered by a Christian school as actually being speech spoken, delivered, or endorsed by FHSAA.

In short, any or all measures to distance CCS's prayer from FHSAA would have constituted a less intrusive means of addressing purported Establishment Clause concerns while still respecting CCS's free exercise rights. But by refusing to consider *any* accommodations for CCS's prayer, FHSAA revealed its haphazard approach to the First Amendment rights of student-athletes. Indeed, it did not even consult CCS's principal or negotiate with the school to seek a solution that worked for all involved parties. That is how a more responsible agency would have acted in this circumstance—and is what the Constitution demands.

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should reverse the judgment below and

enter summary judgment for CCS.

Jeffrey M. Harris
 *Counsel of Record*
Tiffany H. Bates
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

Dated: August 15, 2022          *Counsel for Amicus Curiae*

## **CERTIFICATE OF COMPLIANCE**

This certificate complies with the Rules because it contains 4,714 words and is prepared in a proportionally spaced face using Microsoft Word in 14-point Times New Roman font.

Dated: August 15, 2022                    */s/ Jeffrey M. Harris*

## **CERTIFICATE OF SERVICE**

I filed this certificate with the Court via ECF, which will email everyone requiring notice.

Dated: August 15, 2022                    */s/ Jeffrey M. Harris*

22