

**Jesse Panuccio**
jpanuccio@bsfllp.com

June 21, 2024

**VIA ECF**
David J. Smith
Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

Re: ***Cambridge Christian School, Inc. v. Florida High School Athletic Association, Inc.*, No. 22-11222 – Response to Order requiring supplemental briefing (Doc. 88)**

Dear Mr. Smith:

Pursuant to the Court's Order of June 11, 2024, Doc. 88 ("June 11 Order"), Appellant Cambridge Christian School ("CCS") respectfully submits the following responses to the Court's questions.

**1. "Is it true that Cambridge Chistian School's high school football team will not compete in the FHSAA for the 2024-25 and 2025-26 school years?"**

For thirty-two years, and at all times since this case was filed nearly a decade ago, CCS has been a full member of the Florida High School Athletic Association ("FHSAA"). During the 2024-25 school year, eighteen of twenty-one of CCS's sports teams will compete for the FHSAA State Series, but CCS does not currently plan to have its football team compete for the FHSAA State Series because the team

is in a rebuilding phase.[1] As explained below, CCS has not yet made a decision for the 2025 football season, but CCS intends and expects that its football team will return to FHSAA State Series competition.

**2. "How and when was that decision made and by which party?"**

In 2021, CCS renewed its membership in the FHSAA for a five-year term (the maximum permitted) ending in 2025-26. *See* Butler Decl. ¶ 7.[2] Throughout the course of this litigation, and still today, CCS remains an FHSAA "member school."

---

[1] Undersigned counsel recognizes that "[i]t is the duty of counsel to bring to the federal tribunal's attention, without delay, facts that may raise a question of mootness." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.23(1997) (emphasis and quotation marks omitted). We did not become aware of CCS's decision regarding the 2024 football season until after the Court entered the June 11 Order. We apologize for any inconvenience to the Court. As explained below, CCS's decision to opt out of the FHSAA football State Series this season while the team is in a rebuilding phase does not affect CCS's standing or moot its claims.

[2] To address the questions posed in the June 11 Order, CCS submits the declaration of its Athletic Director, Mark Butler, and requests that the Court permit the record on appeal to be supplemented with that declaration and its accompanying exhibits. *See, e.g.*, *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170–71 (11th Cir. 2006) ("given the length of time that these … suits have been pending, we conclude that it is in the interests of justice and efficiency to consider the supplemental declarations"); *Clark v. K-Mart Corp.*, 979 F.2d 965, 967 (3d Cir. 1992) (en banc) ("[B]ecause mootness is a jurisdictional issue, we may receive facts relevant to that issue; otherwise there would be no way to find out if an appeal has become moot."); *Official Comm. of Unsecured Creditors of Verity Health Sys. of Cal., Inc. v. Verity Health Sys. of Cal., Inc.*, 814 F. App'x 275, 278 n.3 (9th Cir. 2020) ("supplementing the record may be necessary when engaging in a mootness analysis").

*See* FHSSA 2023-24 Bylaws § 3.2.1 (defining "member school" as any school "duly elected to membership").[3] Each year, an FHSAA member school may choose which of its sports teams will compete in the FHSAA and at what level. *See* Bylaws § 3.2.1.5 ("A member school shall have the option of … joining by sport…."); Policies § 10.2.1(a) ("To be eligible for participation in the … State Championship Series in any sport … [t]he school commits to participate in the … State Championship Series with FHSAA prior to the reclassification process, utilizing the official Association process as approved by the Executive Director."). More precisely, a member school may choose from the following options for each of its teams: (1) "State Series" (meaning the team will compete in the FHSAA State Championship Series if the team qualifies based on regular-season results); (2) "Independent" (meaning the team will compete in "FHSAA-approved regular season competition" but not the State Series, *see* Policies § 10.1.3); (3) "Junior Varsity Only" (meaning the schools fields only a JV team); (4) "Middle School Only" (meaning the school fields only a middle-school team); or (5) "No Team" (meaning the school will not have a team competing in FHSAA-sanctioned events). Butler

[3] FHSAA's 2023-24 Bylaws ("Bylaws") and Administrative Policies ("Policies") are available at https://fhsaa.com/documents/2023/7/13//2324_handbook.pdf?id=4394. FHSAA's 2023-24 Football Sport Manual ("Football Manual") is available at https://fhsaa.com/documents/2023/8/14//2324_football_sport_manual_updated.pdf?id=4441.

Decl. ¶ 8 & Ex. 2. Even if a school's team does not declare for the State Series prior to the season, it still has the option to do so after the season begins. *See* Policies § 10.2.1(b) ("A school that does not commit to participate in the Florida High School State Championship Series prior to the reclassification process in that sport may request to be added within the first two (2) weeks of the sport season."). Conversely, schools that declare for the State Series may opt out late in the regular season. *See* Policies § 10.2.1(c) (a school may "request to be added as Independent until three (3) weeks before the state series in that sport"). Furthermore, even if a team declares for the States Series, it is not guaranteed to qualify for the State Series tournament that year. Instead, at the end of the regular season, teams are selected for the State Series (or playoffs) based on their win total and strength of schedule. *See* Football Manual § 4.7.2.2 (explaining that State Series tournament is limited in number of teams that may participate); *id.* § 4.7.1.2.1 (permitting team that "does not qualify for the Florida High School State Championship Series" to play in a bowl game outside the State Series).

CCS has declared for the "State Series" for its football team each year since the school began playing football. *See* Butler Decl. ¶ 10. Like all teams, however, CCS's competitiveness varies from year to year, as players graduate and new players join the roster. *Id.* ¶¶ 11, 13. In 2015, for example, CCS made the State

Championship Game, and it advanced several rounds into the State Series from 2016 through 2020. *Id.* ¶ 11. Over the last few seasons, however, CCS's competitiveness has waned, and it has had repeated turnover in the head-coach position. *Id*. Concurrently, at some of the much larger schools in CCS's FHSAA-assigned district, the talent, size, and strength of athletes surpassed that of CCS's football players. *Id*. Last season, the mismatch between CCS and some teams in its FHSAA district led to significant concerns about CCS player safety. *Id.* ¶¶ 11, 13.

In December 2023, CCS received from FHSAA its annual declaration form for fall sports, on which CCS had to make a selection for each sport. *See* Butler Decl. ¶ 9 & Ex. 1. CCS chose "State Series" for each of its fall sports. Butler Decl. ¶ 10 & Ex. 2.[4] Over the course of the next several weeks, however, CCS conveyed to FHSAA its (and other schools') concerns about the growing competitive mismatch in the district, along with what that mismatch portended for player safety. Butler Decl. ¶ 12. CCS proposed a district alignment that would be more competitive for schools like CCS and safer for their student-athletes. *Id*.

FHSAA, however, chose to maintain a district that matched smaller schools like CCS with larger, powerhouse schools rostered with NFL-caliber prospects. *Id*.

---

[4] CCS's cheerleading teams (fall and winter) have not yet competed in FHSAA's Cheerleading events but may do so in the future. *Id.* at n.2.





Meanwhile, CCS leadership, along with input from parents, assessed the state of the team's roster, which currently does not have an experienced quarterback and has had five head coaches in five years. *Id.* ¶¶ 11, 13. In light of the rebuilding phase of CCS's football program, and FHSAA's decision to maintain districts with uneven competitiveness, CCS chose to change its declaration for the 2024 football season from "State Series" to "No Team." *Id.* ¶ 13. CCS conveyed this decision to FHSAA on January 17, 2024. *Id.* ¶ 13 & Ex. 3. For this coming year, CCS's football team will compete for a different association's postseason tournament. *Id.* ¶ 14. CCS's regular-season schedule nonetheless includes several games against teams that have declared for the FHSAA State Series this year.[5]

This is the first year in CCS's history that the football team has chosen not to declare for the FHSAA State Series. Butler Decl. ¶ 10. CCS fully intends and expects its football team will return to FHSAA State Series competition once its roster has matured. *Id.* ¶ 13. As CCS's athletic director explains, "just a few key players can mean the difference between a championship run and a losing record." *Id*. Moreover, every other sports team at CCS (other than cheerleading) has chosen

[5] CCS's schedule is attached to the Butler Declaration as Exhibit 4 and is available at https://www.maxpreps.com/fl/tampa/cambridge-christian-lancers/football/schedule/. FHSAA "State Series" teams on that schedule include Northside Christian, Evangelical Christian, St. Petersburg Catholic, and Discovery.

the "State Series" option for the 2024-25 school year, such that many CCS student-athletes will continue to compete in FHSAA State Series tournaments this coming year. *Id.* ¶ 10.[6] All of these State Series events feature loudspeaker announcements, just like those at the football State Series games. *See* A-4278–90.

**3. "If, in the future, Cambridge Christian School's football program seeks to return to football competition in the FHSAA, what is the procedure for its return? Would FHSAA have the authority to deny Cambridge Christian Schools permission to return?"**

The procedure for the future will be the same as in years past. CCS will annually receive a form asking it to indicate a preference for each of its sports teams. *See* Bylaws § 3.7.2.3 ("A member school that … applies to continue its membership, will have the option of membership by sport."). For example, the email CCS received in December 2023 stated: "If you believe you may offer the sport, we would encourage you to include that sport in your declarations." Butler Decl. Ex. 1.

Under its governing rules, FHSAA maintains discretion to accept or deny *any* team's membership application or renewal application, and to restrict, suspend, or expel a school's membership. *See* Bylaws § 3.7.4 ("The decision of the Board of Directors whether to admit, elect, or reelect a school to membership must be by

---

[6] Those sports are: Volleyball (Girls); Cross Country (Girls and Boys); Golf (Girls and Boys); Bowling (Girls and Boys); Basketball (Girls and Boys); Soccer (Girls and Boys); Baseball (Boys); Softball (Girls); Tennis (Girls and Boys); Track & Field (Girls and Boys); and Beach Volleyball (Girls). Butler Decl. ¶ 10.





majority vote. The decision will be final."); *id.* § 3.10 (permitting FHSSA to restrict, suspend, or terminate membership for a "member school that fails to meet one or more of the qualifications, conditions and/or obligations of membership"). But, based on historical practice and CCS's long history as a member of FHSAA, CCS would not be denied the ability to declare for the FHSSA football State Series. Butler Decl. ¶ 18. Indeed, when CCS inquired about this issue, an FHSAA official informed CCS that its football team could "absolutely … join at any point permitted by policy as long as you can schedule all required district games." *Id.* ¶ 18 & Ex. 5.

**4. "What effect, if any, does leaving the FHSAA's football competition have on Cambridge Christian School's standing to bring the claims in this lawsuit?"**

CCS's decision not to declare for the FHSAA football State Series for the 2024 season does not affect CCS's standing to bring the claims in this lawsuit.

***a.*** First, CCS's *recent* decision about the 2024 football season does not affect CCS's standing to bring its claims because the "standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome ***when the suit was filed***." *Davis v. Federal Election Commission*, 554 U.S. 724, 734 (2008) (emphasis added). *See also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) ("The doctrine of standing generally assesses whether that interest exists at the outset …."); *West Virginia v. United States Dep't of Treasury*, 59 F.4th

1124, 1135 (11th Cir. 2023) ("We assess Article III standing at the time the complaint is filed."); *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1003 (11th Cir. 2020) ("courts must assess Article III standing as of when a complaint is filed"); *Gen. Land Off. of Tex v. Biden*, 71 F.4th 264, 272 n.12 (5th Cir. 2023) (holding that, "[a]s this action was filed in October 2021, developments since then … will not be considered" for standing analysis) (citing *Davis*, 554 U.S. at 734). CCS filed this suit in 2016, long before its January 2024 decision not to declare for the FHSAA State Series for the upcoming season. Accordingly, the 2024 decision cannot affect CCS's standing to bring claims.

Controlling here are two cases decided by this Court nearly twenty years apart: *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263 (11th Cir. 2003), and *Keister v. Bell*, 29 F.4th 1239 (11th Cir. 2022). In *Focus on the Family*, the plaintiff brought a First Amendment challenge to a Florida governmental body's decision to reject its proposed advertisement for city bus shelters. 344 F.3d at 1268–70. The district court entered summary judgment in favor of the government. On appeal, this Court addressed plaintiff's "standing to seek *prospective* injunctive or declaratory relief." *Id.* at 1274. This Court held that, "[i]mportantly, … Article III standing must be determined as of the time at which the plaintiff's complaint is filed." *Id.* at 1275. The Court proceeded to analyze the

facts as they existed at that time—not at the time of summary judgment or after—and found that plaintiff had standing to seek injunctive and declaratory relief. *Id.* at 1275–76.

In *Keister*, the plaintiff brought a First Amendment challenge to a state university's policy requiring a permit to speak on a public sidewalk. 29 F.4th at 1244. The district court granted summary judgment to the university, and plaintiff appealed. On appeal, the university argued that plaintiff did not have standing because he "testified he would never apply for a permit before speaking on campus," and because the sidewalk was a limited public forum, some kind of permit may be required. *Id.* at 1256. This Court rejected the university's argument. First, this Court noted that plaintiff brought a claim for nominal damages and "could obtain nominal damages, even if he never seeks a permit." *Id.* Second, this Court also held plaintiff had "standing to seek declaratory and injunctive relief." *Id.* The Court reaffirmed the holding of *Focus on the Family* that standing is "assess[ed] … 'as of the time the complaint is filed.'" *Id.* (citing *Focus on the Family*, 344 F.3d at 1275). "And when Keister filed his complaint and right up until the University superseded the old Policy with [a] New Policy well into this litigation, [this Court] could have enjoined the University from enforcing its Policy if [it] concluded that the Policy





was unreasonable or not viewpoint neutral." *Id.* at 1256–57. This Court held that, had it "enjoined the Policy, that itself was the redress Keister sought." *Id.* at 1257.

*Focus on the Family* and *Keister* are directly on point. In both cases, events occurring during the appeal of a summary-judgment order had no bearing on the plaintiff's standing to bring claims, which must be assessed as of the time the complaint is filed. Thus, as in *Keister*, at the time CCS filed its complaint in 2016, a declaration and injunction would have provided "the redress [CCS] sought." 29 F.4th at 1257. Moreover, CCS has standing to obtain nominal damages for past injury, "even if [it] never seeks" to play in an FHSAA football State Series again. *Id.* at 1256.

***b.*** <u>Second</u>, the FHSAA's Prayer Ban—as articulated by Dr. Dearing in 2015—is not limited to football. As he articulated it, the "two pertinent issues" were (1) "the [championship event] facility is a public facility, predominantly paid for with public tax dollars," and (2) "the FHSAA … is legally a state actor" and therefore "cannot legally permit or grant permission for such an activity." *See* A-12607. Those criteria are satisfied across sports, including those for which CCS has declared for the State Series during the 2024-25 school year. And CCS seeks to engage in communal prayer with *all* of its sports teams, A-11935 at ¶ 12; A-11898 at ¶¶ 6–7, such that the Prayer Ban injures CCS across sports. Thus, even if CCS's

post-complaint and post-appeal decision about the 2024 *football* season could be considered in the standing analysis, CCS would still have standing based on its decision to declare for the FHSAA State Series in other sports during the 2024-25 school year.

**5. "What effect, if any, does Cambridge Christian School's leaving the FHSAA's football competition have on the question of whether the request for declaratory relief is moot? On the question of whether the request for injunctive relief is moot? On the question of whether nominal damages could be awarded is moot?"**

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012) (quotation marks omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). Here, despite CCS's decision about the 2024 football season, it is possible for the Court to grant effectual relief to vindicate CCS's continuing interests in the outcome of this litigation.

***a.*** Turning to the last question first, CCS's decision not to declare for the FHSAA football State Series in 2024 has no effect on the question of whether nominal damages may be awarded for FHSAA's infringement of CCS's First Amendment rights in 2015. As this Court held in *Keister*, when a party seeks "nominal damages for the [government's] past alleged violation of [its] First

Amendment rights," "[c]easing an offending policy going forward does not redress an injury that occurred in the past." 29 F.4th at 1251. As "the Supreme Court recently held in *Uzuegbunam* … a request for nominal damages saves a matter from becoming moot as unredressable when the plaintiff bases his claim on a completed violation of a legal right." *Id.* (citing *Uzuegbunam*, 141 S. Ct. at 801–02). Accordingly, binding precedent dictates that CCS's entitlement to nominal damages is not moot.

***b.*** CCS's claims for declaratory and injunctive relief are not moot for two reasons.

First, CCS's decision to forego *one* season of the FHSAA State Series due to safety concerns and lack of competitiveness does not mean CCS will *never* play in an FHSAA State Series tournament again. To the contrary, CCS has a long history of declaring for the State Series (every year but 2024), a long history of making the Series (2015 through 2020), and an intention and expectation to register again for the State Series as soon as its roster has matured. Here, CCS predetermined that, for the upcoming year (nearly a decade after this case was filed), it is not competitive enough to make the State Series. But, in any given year, it is possible that a team will not be competitive enough to make the State Series—or, even if it does, to make it to the championship game. For the reasons explained in CCS's supplemental brief

filed on June 9, 2023, Doc. 71, the fact that the team does not make the championship game every year does not strip CCS of standing or render CCS's claims moot. Indeed, any such rule—that the school must file and fully litigate its case in the two-week window between qualifying for an FHSAA championship event and the event itself—would make this a dispute capable of repetition but evading review. *See FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) ("exception [to mootness] applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation …; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action").

Second, in the upcoming school year, CCS will continue to compete for the State Series in eighteen other sports. FHSAA has never stated that its Prayer Ban is limited to football. To the contrary, the reasoning in Dearing's email applies universally across sports. *See* A-12607 (citing "two pertinent issues": (1) "the facility is a public facility, predominantly paid for with public tax dollars," and (2) "the FHSAA … is legally a state actor" and therefore "cannot legally permit or grant permission for such an activity"). And FHSAA testified that its public-address policy—applicable to *all* sports—does not allow for prayer. *See* A-11025 (Tr. 138:22–139:2) (FHSAA testifying that PA procedure "does not include prayer"); A-11167–74 (FHSAA testifying, in reference to Girls Basketball and other sport





championships that using the PA system to call for a moment of silence to honor God would not be permissible). Accordingly, CCS still faces injury from FHSAA's Prayer Ban irrespective of its choice to forego competing for the football State Series during the 2024 season.

Respectfully submitted,

s/ *Jesse Panuccio*
Jesse Panuccio
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
(954) 356-0011
jpanuccio@bsfllp.com

Adam M. Foslid
WINSTON & STRAWN LLP
200 S. Biscayne Boulevard, Ste. 2400
Miami, FL 33131
(305) 910-0646
afoslid@winston.com

*Counsel for Appellant Cambridge Christian School, Inc.*

Kelly J. Shackelford
Jeffrey C. Mateer
Hiram S. Sasser, III
David J. Hacker
Jeremiah G. Dys
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, TX 75075
(972) 941-4444
jdys@firstliberty.org

Rebecca R. Dummermuth
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave., N.W.
Washington, DC 20004
bdummermuth@firstliberty.org

Eliot Pedrosa
JONES DAY
600 Brickell Ave., Ste. 3300
Miami, FL 33131
(305) 714-9717
epedrosa@jonesday.com